# Exhibit F

The following opinion is presented on-line for informational use only and does not replace the official version. (Mich Dept of Attorney General Web Site - www.ag.state.mi.us)

STATE OF MICHIGAN

**MIKE COX, ATTORNEY GENERAL**

MARRIAGE:  
CONST 1963, ART 1, § 25:

Constitutionality of city providing same-sex domestic partnership benefits

Const 1963, art 1, § 25 operates as a limitation on government conduct and therefore applies to state and local governmental entities, including the City of Kalamazoo.

Const 1963, art 1, § 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a "domestic partnership" agreement that is characterized by reference to the attributes of a marriage. Accordingly, the City of Kalamazoo's Domestic Partner Benefits Policy is contrary to the mandate of Const 1963, art 1, § 25.

Const 1963, art 1, § 25 does not invalidate a state or local governmental entity's existing contractual obligations but does apply to its future contracts.

Opinion No. 7171

March 16, 2005

Honorable Jacob W. Hoogendyk, Jr.  
State Representative  
The Capitol  
Lansing, MI 48913

You have asked to what extent Const 1963, art 1, § 25, the recent amendment to Michigan's Constitution involving same-sex marriages and similar unions, affects the City of Kalamazoo's ability to provide domestic partnership benefits to its city employees both under its current contracts and under new contracts.

The City has informed this office that, in accordance with its Domestic Partner Benefits Policy (the City's Policy), it provides insurance and other benefits to the same-sex "domestic partners" of city employees "identical to those provided to spouses of City employees." The City's Policy, incorporated in its collective bargaining agreements, defines "domestic partners":

For the purposes of the City of Kalamazoo's program, the definition and use of the term *domestic partner* shall only include couples of the same sex. To be considered as domestic partners, the individuals must:

 A. Be at least 18 and mentally competent to enter into a contract;

 B. Share a common residence and have done so for at least six (6) months;

 C. Be unmarried and not related by blood closer than would prevent marriage;

 D. Share financial arrangements and daily living expenses related to their common welfare;

 E. File a statement of termination of previous domestic partnership at least six (6) months prior to signing another Certification of Domestic Partnership. [City of Kalamazoo, Domestic Partner Benefits Policy, ¶ I. (Emphasis in original.)]

The City's Policy requires a notarized Certification of Domestic Partnership, which affirms the criteria listed in paragraphs A through E and requires proof of "mutual economic dependence" and evidence of "common legal residence." *Id.,* at ¶ III, B and C.

The City's Policy explains that the "identical" benefits provided are:

A. Hospital/medical coverage

B. Dental care

C. Sick leave

D. Funeral and critical illness leave

E. COBRA continuation coverage

F. Family Medical Leave Act (FMLA) provisions

G. Retiree medical coverage

H. Pension benefits

The partners have an obligation under the City's Policy to notify the City when there has been a change in any of the circumstances that qualify the couple as a domestic partnership.

On November 2, 2004, Michigan voters approved Proposal 04-2[1], adding art 1, § 25 to Michigan's Constitution.[2]  Const 1963, art 1, § 25 states:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.

Your request, therefore, requires consideration of whether, by entering into a contract that incorporates the City of Kalamazoo's Domestic Partner Benefits Policy, the City recognizes a partnership of persons of the same sex as a "marriage or similar union for any purpose" within the meaning of, and contrary to the mandate of, Const 1963, art 1, § 25.

To ascertain the meaning of a constitutional provision, the courts have laid down a number of controlling rules of interpretation.  It must never be forgotten that "it is a Constitution we are expounding," and that "[e]ach provision of a State Constitution is the direct word of the people of the State, not that of the scriveners thereof." *Michigan United Conservation Clubs v Secretary of State*, 464 Mich 359, 373; 630 NW2d 297 (2001) (Young, J., concurring) (citations omitted).  Thus, the primary rule of construction is to give effect to the intent of the people of the State of Michigan who ratified the Constitution by applying the rule of "common understanding." *Wayne County v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004).  The Michigan Supreme Court reiterated its long-standing reliance on Justice Thomas Cooley's discussion in his treatise Constitutional Limitations to explain the basis for this rule:

> "A constitution is made for the people and by the people.  The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.  'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.'"[3]

Ordinarily, the common understanding of constitutional text is understood by applying each term's plain meaning at the time of ratification.  But if the constitution employs technical or legal terms of art, those terms must be construed according to their technical or legal sense because, "in ratifying a constitution, the people may understand that certain terms used in that document have a technical meaning within the law." *Hathcock*, 471 Mich at 469 n 48.  See also *Michigan Coalition of State Employee Unions v Michigan Civil Service Comm*, 465 Mich 212, 222-223; 634 NW2d 692 (2001).

A second important rule of constitutional construction requires consideration of the circumstances surrounding the provision's adoption and the purpose sought to be accomplished. *House Speaker v Governor*, 443 Mich 560, 580; 506 NW2d 190 (1993).  The historical origins of the provision are relevant in following this rule. *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75, 85; 594 NW2d 491 (1999).  The provision must also be interpreted to give reasonable effect to all, not just some, of its parts. *House Speaker,* 443 Mich at 579.

A threshold issue that must be considered in light of these governing principles is to whom art 1, § 25 applies and whether, in particular, it applies to cities, such as the City of Kalamazoo.  Analysis of this question begins with an examination of the precise language used in art 1, § 25:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.  [Const 1963, art 1, § 25.]

The plain text of this provision is general in scope. It clearly mandates that the union of one man and one woman shall be the only agreement "recognized" as a marriage or similar union, but it does not specifically identify what entities or persons, public or private, are bound by its terms. Its placement in Article 1 of Michigan's Constitution is legally significant, however, in that Article 1, entitled "Declaration of Rights," generally articulates limitations on *government* conduct.

The Michigan Supreme Court elaborated on this point in *Woodland v Michigan Citizens Lobby*, 423 Mich 188; 378 NW2d 337 (1985), in which the issue presented was whether the free speech guarantees of Const 1963, art 1, §§ 3 and 5[4] applied to limit only state action or were directly applicable against private entities as well. The case involved a challenge brought by citizens' groups whose members had been blocked in their efforts to solicit signatures for an initiative petition drive in large shopping malls. In ruling that privately owned shopping malls were not prohibited from denying or restricting access to private individuals, the Court concluded that these provisions of Article 1 were implicitly limited to state action:

The Michigan Constitution's Declaration of Rights provisions have never been interpreted as extending to purely private conduct; these provisions have consistently been interpreted as limited to protection against state action. [423 Mich at 205.]

The *Woodland* case rejected any presumption that would find certain constitutional provisions applicable to private individuals or entities in the absence of direct language requiring it:

> In light of traditionally accepted notions of the limited reach of constitutionally guaranteed individual rights, the past decisions of this Court, the documented history of Michigan's most recent constitutional convention, and the underlying rationale of the state action limitation, it may not be presumed that the constitutional provisions here in question are intended to apply against private individuals or entities. If any presumption is to be raised it is to the contrary: that unless otherwise expressed, constitutionally guaranteed protections are applicable only against government. [*Id*., at 212.]

Accordingly, addressing the precise question raised, it is clear that art 1, § 25's extension of constitutional protection to the "union of one man and one woman in marriage" to "secure and preserve the benefits of marriage for our society and for future generations of children" is applicable against the government. Municipal corporations, including cities, are creatures of the State of Michigan and are, therefore, governmental entities. *Sinas v City of Lansing,* 382 Mich 407, 411; 170 NW2d 23 (1969). Their actions are "subject to the constitution and law." Const 1963, art 7, § 22, quoted in *Mack v Detroit,* 467 Mich 186, 194; 649 NW2d 47 (2002) (emphasis omitted).

It is my opinion, therefore, that Const 1963, art 1, § 25 operates as a limitation on government conduct and therefore applies to state and local governmental entities, including the City of Kalamazoo.

Analysis of your question next turns to the core issue of whether the City's contracts that incorporate its Domestic Partner Benefits Policy violate the mandate of art 1, § 25. To the extent the City recognizes a same-sex partnership "agreement" as a "marriage" or "similar union" for "any purpose," it contravenes the provision. Under the primary rule of constitutional construction, the common understanding of the meaning of each of these operative terms must be ascertained. Analysis will begin with the term on which this amendment is focused: marriage.

The word "marriage" appears three times in art 1, § 25 and is reasonably understood in both a common sense and a technical or legal sense. In chapter 551 of the Michigan Compiled Laws, "marriage" is defined as a "civil contract between a man and a woman, to which the consent of parties capable in law of contracting is essential. Consent alone is not enough to effectuate a legal marriage . . . . Consent shall be followed by obtaining a license . . . and solemnization . . . ." MCL 551.2. "Marriage" is further described in MCL 551.1:

> Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.

Under MCL 551.3, the Legislature prohibits marriage between a man and certain listed family members, blood relations, and other persons, including another man, and under MCL 551.4, the Legislature prohibits marriage between a woman and certain listed family members, blood relations, and other persons, including another woman. Chapter 551 also prohibits bigamy, MCL 551.5, and creates a minimum age for marriage at 16 years of age, MCL 551.51. It further provides the terms for obtaining marriage licenses. MCL 551.101 *et seq.*

These statutory provisions recognize that the term "marriage" has social and legal connotations. Michigan courts have recognized that the public policy of the State of Michigan favors marriage. *Van v Zahorik*, 460 Mich 320, 332; 597 NW2d 15 (1999). This principle is deeply entrenched in our law. *Id.*, at 332 n 4. As observed by the Michigan Supreme Court over a century ago, "society rests upon marriage and the family as its foundation." *Wagoner v Wagoner*, 128 Mich 635, 638; 87 NW 898 (1901).

Moreover, the courts make it clear that marriage is not like any other private contract, but it creates a legal relation in which the spouses and the State have a vested interest. For example, addressing the validity of a marriage, the Court in *Hess v Pettigrew*, 261 Mich 618, 621-622; 247 NW 90 (1933), observed:

> Marriage is a civil contract, but it is not a pure private contract. It is affected with a public interest and by a public policy. The status of children, preservation of the home, private morality, public decency, and the like afford ample grounds for special treatment of marriage as a contract, by statute and decision. In recognition of its public and social nature, courts have cast about it the protecting mantle of presumptions, sustaining validity of marriage, said to be the strongest known to the law. Any rule concerning it must favor the validity of an intended marriage if it may be done without violence to the essentials of the civil contract. [Citation omitted.]

See also *Maynard v Hill*, 125 US 190, 210-211; 8 S Ct 723; 31 L Ed 654 (1888) ("It is also to be observed that, whilst marriage is often termed by text writers and in decisions of courts a civil contract . . . it is something more than a mere contract").

A simple, working definition of marriage that accords with Michigan law is the "[l]egal union of one man and one woman as husband and wife." This is the definition given "marriage" in *Black's Law Dictionary* (6th ed), p 972, and is consistent with the standard dictionary definition: "the state of being united to a person of the opposite sex as husband or wife in a consensual and contractual relationship recognized by law."[5]

Although the meaning of "marriage" is well established, art 1, § 25 states in its first clause that its purpose is "[t]o secure and preserve the *benefits* of marriage for society and our children." (Emphasis added.) Because any examination of the question whether the domestic partnership defined in the City's Policy constitutes a "similar union" to a marriage must be pursued in light of the purpose sought to be accomplished by art 1, § 25, attention now turns to the meaning of this first clause of the amendment.

Two broad categories of "benefits" that stem from marital relationships can be identified: social or societal benefits and legal or financial benefits. With regard to the societal benefits of marriage, the United States Supreme Court has described marriage as "the foundation of the family and of society, without which there would be neither civilization nor progress." *Maynard, supra,* 125 US at 211. Other acknowledged benefits of marriage are that it "confers economies of scale and of joint consumption, minimizes sexually transmitted disease, and provides a stable and nourishing framework for child rearing." *Irizarry v Bd of Educ*, 251 F 3d 604, 607 (CA 7, 2001). The promotion of procreation and child-rearing within a stable environment is among the most often-cited societal benefits of marriage. *Gard v Gard*, 204 Mich 255, 267 (1918) ("It has been said in many of the cases cited that one of the great purposes of marriage is procreation. . . . All true, but there are other purposes of marriage beyond the perpetuation of the species. One of the purposes is the maintenance of the sacred institution called home").

With regard to the legal or financial benefits associated with marriage, the Citizen's Research Council of Michigan summarized some of the major benefits conferred by federal law in its Publication No. 1076 (September 2004) (CRC Memorandum), which was available to voters during the November 2004 general election:

> According to the U.S. General Accounting Office, there are over 1,000 references in the U.S. Code to marital status. Selectively, these include social security benefits, low income housing and food stamp programs, as well as veterans' and military benefits, taxation implications, employment benefits, and immigration and naturalization status. Statutory protections for married couples are also numerous, including legal protections such as the right to not have to testify against one's spouse, domestic violence statutes, custody and child support, and probate statutes, to name just a few. Michigan statutes contain over 400 references to marriage. [CRC Memorandum, State Ballot Issues on the November General Election Ballot, p 6, citing Government Accounting Office, *Defense of Marriage Act*, GAO/OGC-97-16 (Washington, D.C.; January 31, 1997); footnote omitted.]

Michigan law also confers benefits attendant to marriage. For example, Michigan recognizes the common law estate called a tenancy by the entireties, which only a husband and wife can hold. *Sanford v Bertrau,* 204 Mich 244; 169 NW 880 (1918).[6] A select sampling of the Michigan statutes that confer benefits associated with marriage include those involving taxation,[7] death

and sickness,[8] custody and support,[9] property rights,[10] certain legally recognized privileges and presumptions,[11] adoption,[12] eligibility for crime victims compensation and certain veterans' benefits,[13] and retirement and related rights.[14]

Thus, Michigan has historically afforded a combination of social, legal, and financial benefits uniquely to married men and women. It is reasonable to conclude that average citizens when casting their votes at the November 2004 election commonly understood that, to secure and preserve to our society the benefits derived from the institution of marriage, Proposal 04-2 would reserve that unique recognition to the union of one man and one woman in marriage and not allow its extension to similar unions.

Three terms remain for consideration before turning to the amendment's application to the City's Policy: "similar union," "recognized," and "for any purpose." Under the rule of construction requiring an interpretation that gives reasonable effect to all, not just some, of the parts of a constitutional provision, each of these terms must be given full effect. See *House Speaker, supra,* 443 Mich at 579.

With regard to "similar union," the Supreme Court has made clear that words in a constitutional provision must be given their plain meaning if they are obvious on their face. *Phillips v Mirac, Inc,* 470 Mich 415, 422; 685 NW2d 174 (2004). The meaning of "similar union" is clear: a union similar to a marriage. A union is similar to a marriage if it is not a marriage but is characterized by reference to the attributes of a marriage.[15]

Where the words of a provision are as clear as "a similar union," resort to the circumstances surrounding adoption of the provision to assist in clarifying meaning is not necessary. This is especially true in light of the guidance provided by the Supreme Court that surrounding circumstances may be relevant, but are not controlling. *Lapeer County Clerk v Lapeer Circuit Court,* 469 Mich 146, 156; 665 NW2d 452 (2003). Nevertheless, the historical origins of art 1, § 25 and the circumstances surrounding its adoption lend further support to the view that the term "similar union" was understood to have a meaning similar to, but distinct from, marriage.

As stated in the September 2004 CRC Memorandum, the Proposal 04-2 initiative was "part of a national trend of attempts at strengthening same-sex marriage prohibitions by amending state constitutions." [CRC Memorandum at p 1.] The Citizens Research Council noted that Michigan was one of 11 states where the electorate was asked to amend its state constitution. *Id.* Similar proposed amendments appeared on the ballots in 10 other states, all of which passed.[16]

After Proposal 04-2 was officially declared part of the November 2004 ballot,[17] numerous reports, articles, and editorials appeared in the media regarding the amendment. The legal implications of passage were widely discussed, including the continued legality of domestic partner benefits, same-sex or otherwise. The difference in interpretation among the various views expressed on this subject was attributable to the clause "or similar union for any purpose" and the effect the clause would have on domestic partner benefits if the amendment passed. *Id.*

Looking at the circumstances surrounding adoption of Proposal 2, therefore, the issue of domestic partner benefits based on a union similar to marriage was at the forefront of the public debate as voters prepared to go to the polls. Regardless of whether there was agreement regarding the effect the proposal might have on domestic partner benefits, one thing that would clearly have been evident to voters was that benefits provided based on the recognition of a "similar union" were at issue and might be eliminated if the measure passed.

Of greatest significance, however, is the plain language of the amendment itself. Looking at the words "a similar union" in the "sense most obvious to the common understanding," combined with the historical context in which they arose, leads inescapably to the conclusion that "similar union" means a union similar to a marriage but not a marriage.

The final terms of art 1, § 25 to examine are "recognized" and "for any purpose." The term "recognized" appears in conjunction with the term "agreement." When read in context, it is reasonable to conclude that it means "to acknowledge the existence, validity, authority or genuineness of." *Webster's New World Dictionary* (1988). The phrase "for any purpose" modifies the word "recognized." "The word 'any' means just what it says. It includes 'each' and 'every'. It comprehends 'the slightest'." *Sifers v Horen*, 385 Mich 195, 199 n 2; 188 NW2d 623 (1971) (citations omitted). See also *In re Forfeiture of $ 5,264*, 432 Mich 242, 250; 439 NW2d 246 (1989) ("Webster defines the adjective 'any' to mean 'every'"). Thus, giving this phrase its plain meaning, and in the absence of any contextual limitation in the amendment, its meaning is clear and requires no further interpretation: for each and every, or any, conceivable purpose.

Considering these interpretations as a whole, the operative clause of art 1, § 25, "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose," is best interpreted as prohibiting the acknowledgement of both same-sex relationships and unmarried opposite-sex relationships. More simply, the only relationship that may be given any recognition or acknowledgement of validity is the union of one man and one woman in a marriage.

Applying art 1, § 25 to the City of Kalamazoo's Domestic Partner Benefits Policy, the intent of the City is to accord same-sex partners the same health- and retirement-related benefits accorded to married spouses. The policy's threshold criterion requires that only "*couples of the same sex*" may apply for the benefits. To obtain the benefits, the City requires the individuals to fill out a "certification" attesting to their domestic-partnership status. It also requires that the persons applying be "unmarried" and "not related by blood closer than would prevent marriage." These criteria parallel the State of Michigan's definitions in MCL 551.3 and MCL 551.4 that a person may not legally marry a person within one's family. The City's Policy establishes a minimum age requirement as does MCL 551.51. Finally, the certification of domestic partnership requires that any previous domestic partnership have been terminated, which is similar to the State's prohibition of bigamy. See MCL 551.5.

The City's Policy accords same-sex "domestic partnerships" a "marriage-like" status. The clear design of the City of Kalamazoo's policy is to establish a special status for "domestic partners" of the same sex, who share a common residence and financial arrangements, and to use this as a basis on which to confer benefits on the "partner" of the city employee. In the words of art 1, § 25, the City's Policy recognizes same-sex domestic partnerships as a "similar union" to marriage. Given the broad language of the amendment, there can be little doubt that conferring these benefits constitutes recognition or the acknowledgement of the validity of these same-sex relationships. Conferring these health- and retirement-related benefits also falls within the all-encompassing "for any purpose" language.

Thus, the City's policy of offering benefits to same-sex domestic partners violates the amendment's prohibition against recognizing any "similar union" other than the union of one man and woman in marriage. The City's contracts fall squarely within the scope of what the amendment prohibits. The provision of benefits itself does not violate the amendment, but the benefits cannot be given based on the similarity of the union or domestic partnership agreement to a legal marriage. In other words, Const 1963, art 1, § 25 does not prevent the City of Kalamazoo, if it elects to do so, from conferring benefits on persons a city employee may wish to designate as a recipient as long as the benefits are not dependent on the existence of a union that is similar to a marriage as defined by Michigan law.

It is my opinion, therefore, that Const 1963, art 1, § 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a "domestic partnership" agreement that is characterized by reference to the attributes of a marriage. Accordingly, the City of Kalamazoo's Domestic Partner Benefits Policy is contrary to the mandate of Const 1963, art 1, § 25.

The remaining question, then, is whether the amendment applies to existing contracts or only to future contracts. The City may not act contrary to constitutional mandate[18] and, thus, art 1, § 25 prohibits the City from offering domestic partnership benefits, as the City's Policy is currently written, in future contracts. It is basic contract law that a contractual provision that violates the law is void. *Nelson v Galpin*, 277 Mich 529, 541; 269 NW 586 (1936), citing *American Trust Co v Michigan Trust Co*, 263 Mich 337, 340; 248 NW 829 (1933).

With respect to existing contracts offering these benefits, it is "a general rule [that] constitutional amendments operate *prospectively and not retroactively*." *People v Gornbein*, 407 Mich 330, 334; 285 NW2d 41 (1979) (emphasis added), citing 16 CJS, Constitutional Law, § 40, pp 121-122; *Toole v State Bd of Dentistry*, 300 Mich 180; 1 NW2d 502 (1942); *City of Lansing v Michigan Power Co*, 183 Mich 400, 416; 150 NW 250 (1914). For the purpose of this analysis, "retroactive" refers to an application of the amendment that would act as a bar to the future enjoyment of benefits afforded by a contract entered into before the amendment's effective date.

In *Michigan Power Co*, the City of Lansing sought to compel the defendant utility company to remove from the city's streets all poles, wires, and other equipment installed by the company on the basis that the former franchise agreement between the city and the company had expired, and that statutory law authorizing the company to use the city's streets in this way was abrogated by a subsequent constitutional amendment. *Id*., at 402-406. The trial court concluded that once the company invested money and effort into supplying the city with electricity by constructing poles upon city streets, the company had a "contract by user" under the statute, and although the subsequent constitutional amendment abrogated the statute, it did not apply retroactively to this existing contract. *Id.,* at 406-410. In its opinion as quoted approvingly by the Supreme Court, the trial court explained:

> "It is claimed that the act of 1905 has been abrogated or repealed by section 28, art. 8, of the Constitution of 1909 [now commonly cited as Const 1908] . . . .

\* \* \*

> This provision of the Constitution is a wise and radical change in the policy of exercising the sovereign power over the streets, and upon its adoption it at once superseded the act of 1905 and rendered that act from that time inoperative.
>
> The Constitution of 1909 did not revoke and terminate existing user of the streets under Act 264 of 1905. The Constitution did abrogate the law of 1905, *but it did not and could not revoke existing contracts under that act arising out of beneficial user of the streets for public utility purposes.*
>
> *Constitutional provisions, as well as legislative enactments, must be held prospective in operation only, unless they carry upon their face an intention to be retrospective.*" [*Id.*, at 408-409; emphasis added.][19]

The Michigan Supreme Court concurred in the trial court's conclusion with respect to this issue and further explained:

> After examining the many authorities cited by counsel, we are satisfied that the provisions of the new Constitution, cited and referred to in the briefs and arguments, are prospective in their operation. The rule is well stated in volume 6, Am. & Eng. Enc. Law (2d Ed.), at page 917, as follows:
>
> "*Constitutions are construed to operate prospectively only, unless on the face of the instrument a contrary intention is manifest beyond reasonable question.*"
>
> See, also, the many cases there cited. The same rule is applied to statutes. [*Id.*, at 416; see also 16 Am Jur 2d Constitutional Law § 46 and *Traverse City v Michigan Railroad Comm*, 202 Mich 575; 168 NW 481 (1918); emphasis added.]

Accordingly, in determining whether a statute or a constitutional amendment should be applied retroactively, "the primary and overriding rule is that . . . intent governs. All other rules of construction and operation are subservient to this principle." *Lynch v Flex Technologies, Inc*, 463 Mich 578, 583; 624 NW2d 180 (2001) (internal citations omitted). A constitutional or statutory provision will be presumed to operate prospectively unless a contrary intent is clearly manifested. *Id.; Michigan Power Co, supra.* This is especially so if retroactive application of the statute or amendment would impair vested rights,[20] create a new obligation and impose a new duty, or attach a disability with respect to past transactions. *Lynch, supra*, 463 Mich at 583; *Gornbein, supra*, 407 Mich at 334 ("[C]onstitutional amendments operate prospectively and not retroactively. This is particularly so where the constitutional amendment would affect a substantive right.")

There is nothing in the text of art 1, § 25 that clearly manifests an intention that the amendment apply retroactively. Again, the amendment states, "[t]o secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." The words "secure" and "preserve" do not suggest retroactive application. Thus, there is no language in art 1, § 25 that manifests beyond a reasonable question that it was intended to apply retroactively. *Michigan Power Co*, *supra.*

Moreover, art 1, § 25 does not fall within the recognized "exception" to prospective application for laws "which operate in furtherance of a remedy or mode of procedure and which neither create new rights nor destroy, enlarge, or diminish existing rights." *Lynch*, *supra,* 463 Mich at 584 (internal citations omitted). The provision is clearly an expression of public policy, and not a remedial or procedural law that would fall within the exception. Indeed, its retroactive application could "change significantly the substance of the parties' agreement and unsettle their expectations." *Id.,* at 585-586.[21]

Thus, in accordance with these general principles and in the absence of any contrary indications in the amendment or the circumstances surrounding its passage, Const 1963, art 1, § 25 applies prospectively only. Generally, depending on the specific terms of the various contracts entered into and the surrounding factual circumstances, any new contractual obligations taking effect on or after December 18, 2004, including extensions and renewals of contracts entered into before that date, must comply with the mandate of art 1, § 25. Similarly, with respect to those employees who work for the City pursuant to an employment policy or implied contract, a definitive answer depends on the actual facts and circumstances. Generally, however, for those employees not covered by a collective bargaining agreement, personal services contract, or other formal contractual arrangement, art 1, § 25

prohibits the continuation of domestic partnership benefits on or after December 18, 2004, except with respect to those benefits already accrued or vested and provided that the employer gives affected employees reasonable notice of the policy change.[22]

It is my opinion, therefore, that Const 1963, art 1, § 25 does not invalidate a state or local governmental entity's existing contractual obligations but does apply to its future contracts.

MIKE COX
Attorney General

---

[1] Of 4,602,396 votes cast, 2,698,077 voted in favor of the amendment and 1,904,319 voted against the measure. See http://miboecfr.nicusa.com/election/results/04GEN/90000002.html..

[2] By constitution, Proposal 2 became effective December 18, 2004, "at the end of 45 days after the date of the election at which it was approved." Const 1963, art 12, § 2.

[3] *Hathcock,* 471 Mich at 468, quoting *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), in turn quoting from 1 Cooley, Constitutional Limitations (6th ed), p 81 (emphasis omitted). See also *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000).

[4] Const 1963, art 1, § 3 states: "The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances." Const 1963, art 1, § 5 states: "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

[5] *Meriam-Webster Online Dictionary,* http://www.meriam-webster.com%20/. See also *Baker v Vermont*, 170 Vt 194, 199; 744 A2d 864, 868 (2000) ("Although it is not necessarily the only possible definition, there is no doubt that the plain and ordinary meaning of 'marriage' is the union of one man and one woman as husband and wife"); *Adams v Howerton*, 486 F Supp 1119, 1122 (CD Cal, 1980) (Concluding that "marriage" is "a contract, a status, and a relationship between persons of different sexes").

[6] See Michigan Land Title Standards (5th Ed), State Bar of Michigan, Standard 6.5. Lands held as tenants by the entireties cannot be conveyed to others or encumbered without the consent of both husband and wife. *Arrand v Graham,* 297 Mich 559; 298 NW 281 (1941); *Nurmi v Beardsley*, 275 Mich 328; 266 NW 368 (1936). Neither can judgment-creditors obtain execution against such interests unless the judgment debt is one for which both spouses are liable. *Sanford, supra; Muskegon Lumber & Fuel Co v Johnson,* 338 Mich 655, 658; 62 NW2d 619 (1954).

[7] See, e.g., MCL 205.93 (exemption from use tax for transfer of personal property); MCL 205.202 (tax exemption for transfer of property); MCL 205.202c (tax exemption for surviving spouse benefits); and MCL 206.514, 206.520 and 206.522 (tax credits for senior citizens and spouses).

[8] See, e.g., MCL 257.236 (right to transfer title of deceased spouse's vehicle); MCL 333.2855 (right to request autopsy); MCL 333.10102 (authority to make gift of deceased's body); MCL 333.20201 (right of nursing home resident to meet privately with spouse, right of married residents to reside in same room, and right of spouse of terminally ill resident to stay at facility 24 hours a day); MCL 338.847 and 338.1076 (right to carry on business of deceased spouse holding certain licenses for 90 days after death); MCL 390.1243 and 390.1263 (higher education tuition waiver for spouse of police officer, firefighter, or correction officer killed in line of duty); MCL 419.203 (death benefits for spouse of firefighter); MCL 550.2003 (eligibility for prescription drug coverage under the Elder Prescription Insurance Coverage program); MCL 28.634 (death and disability benefits for spouses of public safety officers); MCL 32.49d, 32.810, and 32.811 (death benefits for spouses of military officers and enlisted persons); MCL 500.3708 (coverage under small employer health benefit plans).

[9] See, e.g., MCL 552.15 and 552.16 (child custody, parenting time, and child support); MCL 552.18 and 552.101 (rights to

spouse's pension, annuity, and retirement benefits upon annulment, divorce, or judgment of separate maintenance); MCL 552.19 (property rights upon annulment, divorce, or judgment of separate maintenance); MCL 552.23 (spousal and child support); MCL 722.124 (right to place child in control and care of another person – i.e., daycare/child care centers); and MCL 552.401 (award of property upon decree of divorce or separate maintenance).

[10] See, e.g., MCL 558.1 – 558.14 (rights to dower in lands); MCL 700.2201-700.2206 (elective share of surviving spouse in deceased spouse's estate); and MCL 700.2301 (rights in spouse's estate).

[11] See, e.g., MCL 600.2162 (spousal privilege) and MCL 700.2114 (presumption that spouses are the natural parents of children born during marriage).

[12] See, e.g., MCL 710.24.

[13] See MCL 18.354 and 18.361 (crime victims' compensation) and MCL 36.31 (spouse of veteran qualified for residence in veterans' facility).

[14] See, e.g., MCL 38.27 and 38.31 (interest in spouse's retirement allowance under state employee retirement system); MCL 38.556 (interest in spouse's retirement allowance, disability and death benefits under firefighters and police officers retirement system); MCL 38.1024 (interest in spouse's retirement allowance under legislative retirement system); MCL 38.1050a (life insurance benefits under legislative retirement system); MCL 38.1050b (health insurance benefits under legislative retirement system); MCL 38.1391 (health care benefits under school employee retirement system); MCL 38.1389 and 38.1390 (interest in spouse's retirement allowance and worker's disability compensation under school employee retirement system); MCL 38.1391 (health insurance benefits under school employee retirement system); MCL 38.1624 - 38.1630 (interest in spouse's retirement allowance under state police retirement system); and MCL 38.2508 (interest in spouse's retirement allowance under judges retirement system); MCL 38.2669 (health insurance benefits under judges retirement system).

[15] No Michigan statute recognizes a relationship that could be considered a "similar union."  Other states do have such statutes, however.  For example, Vermont's "civil union" statute, 18 VSA §§ 5160 *et seq*, and California's "domestic partner" act, Cal Fam Code §§ 297 *et seq*, which allow couples of the same sex, and opposite-sex couples under certain circumstances, to achieve state-licensed relationships would appear to fall within the "similar union" category.  Other states offering certain benefits to same-sex couples include Hawaii (Reciprocal Beneficiaries Act, 1997 PA 383), and New Jersey (Family Equality Domestic Partnership Act, 2003 NJ ALS 246, 2).  Massachusetts now offers full marital benefits to same-sex married couples pursuant to the holding in *Goodridge v Dep't of Public Health*, 440 Mass 309, 322-325; 798 NE2d 941 (2003).  See also *Baehr v Lewin*, 74 Haw 530, 561; 852 P2d 44 (1993) and *Baker v Vermont*, 170 Vt 194, 220-222; 744 A2d 864 (2000).

[16] The other states were Arkansas, Georgia, Kentucky, Mississippi, Montana, North Dakota, Ohio, Oklahoma, Oregon and Utah.  Louisiana held a ballot issue vote on September 18, 2004, which resulted in passage of the amendment.  (La Const, Art XII, § 15.)  See CRC Memorandum No. 1076, at http://www.crcmich.org/PUBLICAT/2000s/2004/memo1076.pdf.  The courts have relied on the work of the Citizens Research Council in the past.  See *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 474; 208 NW2d 469 (1973); *Butcher v Grosse Ile Twp,* 387 Mich 42, 75; 194 NW2d 845 (1972); *WPW Acquisition Co v City of Troy,* 250 Mich App 287, 312; 646 NW2d 487 (2002).

[17] A lawsuit filed before the election resolved challenges regarding whether the proposal was properly placed before Michigan voters.  See *Citizens for Protection of Marriage v Bd of State Canvassers*, 263 Mich App 487; 688 NW2d 538 (2004), aff'd ___ Mich ___; 2004 Mich. LEXIS 2072 (2004).

[18] Const 1963, art 7, § 22; *Mack v Detroit*, *supra,* 467 Mich at 194; *Mich Coalition for Responsible Gun Owners v City of Ferndale*, 256 Mich App 401, 406-407; 662 NW2d 864 (2003).

[19] When the Michigan Constitution of 1963 was adopted, it made clear that its provisions applied prospectively: "[a]ll writs, actions, suits . . . contracts, claims, demands . . . existing on the effective date of this constitution shall continue unaffected except as modified in accordance with the provisions of this constitution."  Mich Const 1963, sched § 2.

[20] "Vested rights" have been defined as "an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice."  *Detroit v Walker*, 445 Mich 682, 699; 520 NW2d 135 (1994).  But there can be no vested right in an existing law that precludes its change or repeal.  *Harsha v Detroit*, 261 Mich 586, 594; 246 NW 849 (1933).  See also *New York CR Co v White*, 243 US 188, 198; 37 S Ct 247; 61 L Ed 667 (1917).

[21] This opinion does not address the issue of whether retroactive application of art 1, § 25 would violate the Contract Clauses of the Federal and Michigan Constitutions, which generally prohibit the enactment of state laws that impair existing contractual obligations. US Const, art I, § 10; Const 1963, art 1, § 10; *Allied Structural Steel Co v Spannaus*, 438 US 234, 242; 98 S Ct 2716; 57 L Ed 2d 727 (1978). Article 1, § 10 of the Michigan Constitution provides, "[n]o bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." An amendment to the state constitution is a law for purposes of the Contracts Clause. *State Hwy Comm'r v Detroit City Controller*, 331 Mich 337, 354; 49 NW2d 318 (1951); *Public Service Comm v Cheboygan*, 324 Mich 309, 321; 37 NW2d 116 (1949). Such a determination can only be made on a case-by-case basis and is dependent on a number of factual and legal variables that are beyond the scope of this opinion.

[22] See *In re Certified Question*, 432 Mich 438, 456-457; 443 NW2d 112 (1989) (An employment policy is "not a perpetually binding contractual obligation" and, therefore, the employer may "unilaterally change" such policies). For a discussion of the circumstances under which an implied contract may be found and deemed enforceable against an employer, see *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980), and *Manning v City of Hazel Park*, 202 Mich App 685; 509 NW 2d 874 (1993).

http://opinion/datafiles/2000s/op10247.htm

State of Michigan, Department of Attorney General
Last Updated 11/10/2008 14:49:34