# Exhibit I

# Legislative Analysis



**PROHIBIT DOMESTIC PARTNERS BENEFITS
AND EXCLUDE FROM COLLECTIVE BARGAINING**

Mary Ann Cleary, Director
Phone: (517) 373-8080
http://www.house.mi.gov/hfa

**House Bill 4770 (reported without amendment)**
**House Bill 4771 (Substitute H-1)**
**Sponsor: Rep. Dave Agema**
**Committee: Oversight, Reform, and Ethics**

**First Analysis (9-6-11)**

*BRIEF SUMMARY:* The bills would prohibit public employers from including domestic partner benefits in their public employee compensation packages, and would make domestic partner benefits a prohibited subject in collective bargaining.

*FISCAL IMPACT:* Under House Bill 4770, the fiscal impact to the state would be a savings of the estimated $8.0 million in costs for providing such benefits to state employees beginning with Fiscal Year 2011-12. Approximately 50 percent, or $4.0 million, of the estimated savings amount would accrue to the state's General Fund. House Bill 4771 would have no direct fiscal impact to the state.

*THE APPARENT PROBLEM:*

On November 2, 2004, Michigan voters approved an initiative called Proposal 04-2, to add a "defense of marriage" amendment to the State Constitution. Fifty-nine (59) percent of the electors voted yes, while 41 percent voted no. The proposal went into effect on December 18, 2004. With this constitutional amendment, Michigan joins 30 states that have banned legal recognition of same-sex unions in state constitutions.

Proposal 04-2 makes it unconstitutional for the state to recognize or perform same-sex marriages or civil unions. It is found in Article I, Section 25, and reads:

*§ 25 Marriage.*
*To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.*

On March 16, 2005, in response to a state representative's request for an opinion regarding the marriage amendment's effect on the City of Kalamazoo's ability to provide same-sex domestic partner health insurance benefits to its employees, Attorney General Mike Cox issued a formal opinion, concluding that the city's policy violated the amendment. Specifically, *the attorney general ruled that "Const 1963, art 1, section 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a 'domestic partnership' agreement that is characterized by reference to the attributes of a marriage."* OAG No. 7,171 (March 16, 2005), 2005 Mich Reg 5, p 35.

On March 21, 2005, National Pride at Work, Inc., filed, in the Michigan Supreme Court, a declaratory judgment action against the Governor, seeking a declaration that the marriage amendment did not bar public employers from providing health insurance benefits to their employee's qualified same-sex domestic partners. The Attorney General, acting on the Governor's behalf, moved to dismiss the suit, on the basis that the plaintiffs lacked standing. Because then-Governor Jennifer Granholm disagreed with the Attorney General's interpretation, she obtained independent counsel, and withdrew the Attorney General's motion. She then filed a brief supporting the plaintiffs' position. Plaintiffs moved for summary disposition, arguing that the amendment does not prohibit public employers from voluntarily providing the benefits. The trial court agreed, saying: "By voluntarily providing domestic partner health care benefits to an employer-defined group of people, the plaintiffs' employers are not "recognizing a marriage or similar union." The Attorney General appealed the trial court's decision. The Court of Appeals then reversed the trial court's decision and granted a stay, concluding that the amendment prohibited public employers from granting health benefits to their employees' same-sex domestic partners, and also granting leave to appeal the case to the Michigan Supreme Court.

Plaintiffs in the case argued that throughout the campaign to pass Proposal 04-2 (both before the Board of State Canvassers during the public hearing to certify their petition, and in written campaign documents), the proposal's supporters—Citizens for the Protection of Marriage, a committee sponsored by Michigan Christian Citizens Alliance—repeatedly stated that the constitutional amendment would not prohibit public employers from entering into contracts with their employees to provide domestic partner health care benefits. Instead, they said that Proposal 04-2 was *only* about marriage. For example, the attorney for Citizens for the Protection of Marriage, Eric Doster, assured the board that their proposal would not bar public employers from providing benefits to their employees' same-sex domestic partners, saying: "There would certainly be nothing to preclude a public employer from extending [health care] benefits, if they so chose, as a matter of contract between employer and employee, to...domestic dependent benefits..." and, "An employer, as a matter of contract between employer and employee, can offer benefits to whomever the employer wants to...", and "I'd hate to be repetitive, but again, that's a matter of contract between an employer and employee. And if the employer wanted to do that...I don't see how this language affects that. If the language just said 'marriage' or 'spouse,' then I would agree with you. But there's nothing in this language that I would interpret that would say that that somehow would go beyond that."

Plaintiffs, arguing that health coverage is a contractual benefit of employment, and not of marriage, also demonstrated that in an August 2004 poll of 705 likely voters, 65 percent of the voters disapproved of barring cities and counties from providing domestic-partner benefits, and 63 percent disapproved of prohibiting state universities from doing so.

On May 7, 2008, the Michigan Supreme Court, in a 5-2 ruling, interpreted the constitutional ban on same-sex marriage to prohibit employers from extending health care benefits to their employees' same-sex domestic partners. (Those voting to bar health benefits were Justices Stephen Markman, Clifford Taylor, Elizabeth Weaver, Maura

Corrigan, and Robert Young; those offering a dissent were Justices Marilyn Kelly and Michael Cavanagh.) In a 34-page opinion whose analysis (among other things) parses the 'marriage amendment's' phrases "similar union," "recognized," "only agreement," "for any purpose," and benefits of marriage," Justice Stephen Markman advanced the argument that the meaning of the intrinsic language of the constitutional amendment, is, on its face, plain. It prohibits the recognition of unions <u>similar</u> to marriage "for any purpose." In his interpretation, the phrase "for any purpose" modified the word "similar." Concluding that marriage and domestic partnerships were similar, he held that the 'marriage amendment' "prohibits public employers from providing health insurance benefits to their employees' qualified same-sex domestic partners."

In contrast, Justice Marilyn Kelly, the author of the dissent, argued that Markman's interpretation was problematic, because the "language of the amendment itself prohibits nothing more than the recognition of same-sex marriages or similar unions. It is a perversion of the amendment's language" she continued, "to conclude that, by voluntarily offering the benefits at issue, a public employer recognizes a union similar to marriage." In her argument, Kelly said: "The 'marriage amendment' undertakes to accomplish its purpose of protecting the benefits of marriage by providing that 'the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.' Through this language, the amendment prohibits the recognition of same-sex [1] marriage or [2] similar union[s]. It is clear that the employee-benefit programs at issue do not recognize same-sex marriage." *National Pride at Work, Inc. v Governor of Michigan,* Docket No. 133429. For more detail, see **Background Information**.

Since 1850, Michigan has extended constitutional autonomy to its public universities. Michigan differs from the majority of states in that it has no statewide agency, board or commission responsible for the coordination of higher education, and all four-year institutions have constitutional autonomy. Constitutional autonomy provides for vesting of exclusive management and control of the institution in the governing board. Michigan's language regarding constitutional autonomy, which can be found in all four state constitutions, is designed to keep the legislature from getting involved in areas considered to be the domain of the faculty and university administration. (Indeed, the provision was added to the state constitution in the 1800s because members of the legislature were reportedly firing faculty at the University of Michigan).

In 1963, Michigan rewrote its most recent constitution and once again included constitutional status for all universities in the state. Article VIII, Section 3 states reads: *"The power of the institutions of higher education provided in this constitution to supervise their respective institutions and control and direct the expenditures of the institutions funds shall not be limited to this section."*

Further, at Article VIII, Sections 5 and 6 of the Michigan Constitution, university governing boards are granted *"general supervision of its institution and the control and direction of all expenditures from the institution's funds."*

Based on this language, and advancing the argument that market forces decide best what educational services a particular university should offer, individual university boards of regents or trustees have the power to set tuition and to determine how their state appropriations will be spent.

While university presidents and trustees have management autonomy, public universities are public employers, and many of them extend health care benefits, as employee benefits, to the same-sex partners of their faculty (as well as to their dependents), not as domestic partners, but rather as "other eligible individuals." Additionally, some local government officials also extend health care coverage to domestic partners, dropping the "same sex" and adopting the wording "other qualified adults."

Finally, in 2004, before the "defense of marriage" amendment to the State Constitution passed, the Office of the State Employer and the state employees represented by the United Auto Workers Local 6000, reached an agreement to include same-sex domestic partner health-insurance benefits in the benefit package for state employee members of the union. However, the parties agreed not to submit that proposed contract to the Michigan Civil Service Commission until the Supreme Court made its ruling, in order to ensure that the language of the proposed contract did not violate the marriage amendment. More than six years later, on January 26, 2011, the Michigan Civil Service Commission approved the negotiated benefit package, so that the state now extends health care benefits, as benefits of employment, to all of a state employee's qualified domestic partners (whether same sex or opposite sex) and to their dependents.

Now legislation has been introduced to prohibit all public employers—that is, those employed by the state government, local governments, school districts, and all public universities and colleges, as well as others—from offering any domestic partner benefits (both same-sex partner benefits and opposite sex partner benefits) in their public employee compensation packages. Further, the legislation would make domestic partner benefits a "prohibited subject" in collective bargaining, thereby prohibiting any discussion of the topic during labor negotiations, at the risk of an employer filing an unfair labor practice charge against the employees' collective bargaining team.

*THE CONTENT OF THE BILLS:*

The bills would prohibit public employers from including domestic partner benefits in their public employee compensation packages, and would make domestic partner benefits a prohibited subject in collective bargaining. House Bill 4771 is tie-barred to House Bill 4770 so that it could not go into effect unless House Bill 4770 is also enacted into law. A more detailed description of each bill follows.

House Bill 4770 would create a new act to be known as the Public Employee Domestic Partner Benefit Restriction Act. The new act would prohibit a public employer from providing medical benefits or other fringe benefits for an individual currently residing in the same residence as an employee of the public employer who is not (1) married to the employee; (2) a dependent of the employee, as defined in the federal Internal Revenue

Code; or (3) otherwise eligible to inherit from the employee under the laws of intestate succession in Michigan.

The bill would define "public employer" to mean the state, a city, village, township, county, or other political subdivision of this state; any intergovernmental, metropolitan, or local department, agency, or authority, or other local political subdivision; a school district, a public school academy, or an intermediate school district, as those terms are defined in Sections 4 to 6 of the Revised School Code; a community college or junior college described in Section 7 of Article VIII of the State Constitution of 1963; or an institution of higher education described in Section 4 of Article VIII of the State Constitution of 1963.

The bill specifies that if a collective bargaining agreement or other contract that is inconsistent with the new act is in effect for an employee of a public employer on the effective date that this legislation is enacted into law, then the requirements in this new act would not apply until the collectively bargained agreement or other contract had expired, or was amended, extended, or renewed.

Finally, House Bill 4770 specifies that the requirements of the new law would apply to all public employers to the greatest extent consistent with constitutionally allocated powers.

House Bill 4771(H-1) would amend the Public Employment Relations Act (MCL 423.215) to make domestic partner benefits a prohibited subject during collective bargaining.

Now under the law, certain topics cannot be negotiated during collective bargaining, because they remain entirely within the authority of managers to decide. Consequently, the topics prohibited under the law may not be discussed at the bargaining table, at the risk of being charged with an unfair labor practice. House Bill 4771 would expand the prohibited topics to include domestic partner benefits. Specifically under the bill, public employers and public employees would be prohibited from negotiating as a subject of bargaining, "health insurance or other fringe benefits for any individual currently residing in the same residence as an employee of a public employer on terms that conflict with the Public Employee Domestic Partner Benefit Restriction Act" (the new law that would be created with the enactment of House Bill 4770).

## BACKGROUND INFORMATION:

To read the Michigan Supreme Court case, *National Pride at Work, Inc. v Governor of Michigan*, Docket No. 133429, in its entirety, visit:
http://www.courts.michigan.gov/supremecourt/Clerk/11-07/133429/133429-Opinion.pdf

## FISCAL INFORMATION:

According to the Office of the State Employer, costs to the state for providing benefits to other eligible adult individuals are estimated to be $8.0 million for the first year, and are

expected to be higher in subsequent years as the program becomes more widely known and utilized. The effective date of the policy providing benefits to other eligible adult individuals is October 1, 2011. This cost estimate is based on the assumption of (1) a participation rate of about 66 percent of eligible state employees and (2) current State Health Plan rates.

Under HB 4770, the fiscal impact to the state would be a savings of the estimated $8.0 million in costs for providing such benefits to state employees beginning with Fiscal Year 2011-12. Approximately 50 percent, or $4.0 million, of the estimated savings amount would accrue to the state's General Fund.

Comprehensive data are not available, so estimates cannot be made for what the savings would be for other public employers defined in the bill (i.e. city, village, township, county, political subdivision, school district, community college, public university, etc.).

HB 4771 would have no direct fiscal impact on the state.

## ARGUMENTS:

### For:

Proponents of these bills advance three arguments. First and foremost, they say any public employer who extends health care insurance to same-sex or opposite-sex domestic partners is clearly breaking the law. Proponents say the legal case is clear. In 2004, the citizens of Michigan approved the "defense of marriage amendment" to the state constitution by passing Proposal 04-2, 61 percent to 49 percent. That language, found in Article I, Section 25, makes it unconstitutional for the state to recognize or perform same-sex marriages or civil unions. Further, in 2005, then Attorney General Mike Cox issued a formal opinion, concluding that "Const 1963, art 1, section 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a 'domestic partnership' agreement that is characterized by reference to the attributes of a marriage." Finally, in 2008, the Michigan Supreme Court, in a 5-2 ruling, upheld that interpretation of the constitutional "defense of marriage" amendment, ruling that the constitutional ban on same-sex marriage prohibits employers from extending health care benefits to their employees' same-sex domestic partners.

Second, proponents say the bills will save taxpayers money. Proponents note that those public employers who are in violation of the 'defense of marriage' law are wastefully spending the taxpayers' money with complete disregard for Michigan's constitution. They point-out that for the state alone, elimination of these benefits will save taxpayers at least $8 million in the first year of implementation. As the bill sponsor noted, "At the University of Michigan alone, there are 618 people receiving the benefits who shouldn't be. That's at a cost of from $7,000 to $10,000 per person." When the cost of all of the domestic partner benefits that are now offered by public employers is tallied, and the benefits are eliminated, then the cost-savings will be much, much higher.

Third, these bills are needed, proponents argue, because public employers—including the state, local units of government, and universities—and their employees have found ways around the law that is now a part of the Michigan Constitution, by avoiding the clearly prohibited language barring health benefits for same-sex partners that is found in the opinions offered by the Attorney General in 2005, and the Michigan Supreme Court in 2008. For example, the Michigan Civil Service Commission approved a negotiated benefit package in January 2011, so that the state will soon extend health care benefits to its employees represented by UAW Local 6000, and to their "qualified" domestic partners (same sex or opposite sex) and their dependents. Further, some public universities extend health care benefits to the same-sex partners of their faculty and staff (as well as to their dependents), not as domestic partners, but rather as "other eligible individuals." Additionally, some local government officials also extend health care coverage to domestic partners, without using the phrase "same sex," but instead adopting the wording "other qualified adults."

*Against:*

Opponents of these bills offer five arguments. First, they say that any effort to extend these laws to Michigan universities is unconstitutional. They point out that Michigan has granted constitutional autonomy to its public universities for more than 160 years—autonomy that is described in Article VIII of the state constitution. In fact, Michigan differs from the majority of states in that it has no statewide agency, board or commission responsible for the coordination of higher education. Instead, all four-year institutions have constitutional autonomy, which means that the exclusive management and control of the institutions rest with their governing boards.

Further, at Article VIII, Sections 5 and 6 of the Michigan Constitution, a university governing board is granted *"general supervision of its institution and the control and direction of all expenditures from the institution's funds."* Based on this language, and advancing the argument that market forces decide best what educational services a particular university should offer, individual university boards of regents or trustees have the power to determine how their state appropriations will best be spent. Opponents of these bills note that the legal counsel to Governor Rick Snyder, in a letter dated May 18, 2011, has already advised the legislature that for these reasons, two provisions of their early higher education funding bill were unconstitutional and unenforceable—in particular, the provisions, since eliminated, that would have required stem-cell research reporting to the Department of Community Health, and also the provision that would have required a 5 percent appropriation offset until university officials certified to the Department of Treasury that they did not offer unmarried co-resident benefits.

Second, opponents of this legislation argue that to bar health care coverage for domestic partners and their dependents puts Michigan at a distinct disadvantage in the research, development, and dissemination of new products. The prohibition is economically wrong, and it is wrong at a time when Michigan's economic recovery is fragile. For example, a policy to bar public employers such as universities from offering health insurance to *all* of their faculty members makes far more difficult their task of recruiting the world's foremost laboratory research scientists and top-flight academic talent in the

applied sciences. As a spokesman for the Department of Civil Rights said during committee testimony, such a policy sends the explicit message that "we don't like you, and that is not a message we can afford to be sending. We need to create a place that is welcoming to businesses and entrepreneurs."

Third, opponents of the bill argue that a policy to prohibit public employers from offering health care benefits to domestic partners is morally wrong. They say, all people need and use health care services, including young children. And in the instance where longtime same-sex partners are denied the right to marry, and then are also denied the legitimate benefits of employment extended to their married colleagues because they remain unmarried, they clearly suffer indefensible discrimination as second-class citizens. Further, their dependent children suffer, as well. According to committee testimony, many same-sex couples have birthed children, adopt children, or serve as foster parents, so they rely on the dependent health benefit coverage that is offered by their employers' health insurance plans. To deny these families the same benefits as are offered to traditional opposite-sex families is clearly discriminatory and morally indefensible.

Fourth, those opposing the bills point out that extrinsic evidence, offered by the plaintiffs in their argument before the Michigan Supreme Court, indicates that Michigan voters did not intend to deny health care coverage to domestic partners when they voted on the "defense of marriage" law. Indeed, in an August 2004 poll of 705 likely voters, 65 percent of the voters disapproved of barring cities and counties from providing domestic-partner benefits, and 63 percent disapproved of prohibiting state universities from doing so. Opponents of the bills say that the organizations behind the successful campaign to add a "defense of marriage" provision to Michigan's constitution continually confused voters during the 2004 campaign—both before the Board of State Canvassers when the clarity of the proposal's language was questioned, and again in written documents circulated during the campaign—as they repeatedly stated that the constitutional amendment would not prohibit public employers from entering into contracts with their employees to provide domestic partner health care benefits. Instead, they said that Proposal 04-2 was *only* about marriage.

Finally, opponents of the bills say the bills' proponents are wrong to think that the legislation is necessary to implement Proposal 04-2. They argue that the majority opinion of the Michigan Supreme Court in the case *National Pride at Work, Inc. et al* is fatally flawed, because the "language of the amendment itself prohibits nothing more than the recognition of same-sex marriages or similar unions." They say, as does the Michigan Supreme Court Justice who authored the dissent, "It is a perversion of the amendment's language to conclude that, by voluntarily offering the benefits at issue, a public employer recognizes a union similar to marriage." Opponents of the legislation's intent say: "The 'marriage amendment' undertakes to accomplish its purpose of protecting the benefits of marriage by providing that 'the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose. Through this language, the amendment prohibits the recognition of same-sex [1] marriage or [2] similar union[s]. It is clear that the employee-benefit programs at issue do not recognize same-sex marriage." The benefit plans are simply

contracts between employers and employees. Further, public employers are not required to provide health benefits to spouses. "Therefore, it makes no sense to find that health benefits are *benefits of marriage*... Instead, the health benefits at issue are *benefits of employment*. The amendment's stated purpose does not protect or restrict employment benefits." Therefore, barring public employers from providing benefits does nothing to further the purpose of the 'marriage amendment.'

## *POSITIONS:*

The Michigan Department of Civil Rights opposes the bills. (6-21-11)

The ACLU of Michigan opposes the bills. (6-21-11)

Equality Michigan opposes the bills. (6-21-11)

The Michigan Townships Association opposes the bills. (6-21-11)

The Michigan State Employees Association opposes the bills. (6-21-11)

The AFL-CIO opposes the bills. (6-21-11)

The Michigan Chapter of the National Association of Social Workers opposes the bills. (6-21-11)

The Service Employees International Union (SEIU) Local 517 opposes the bills. (6-21-11)

Michigan National Organization for Women opposes the bills. (6-21-11)

EPIOA Consulting opposes the bills. (6-21-11)

Legislative Analyst: J. Hunault<br>
Fiscal Analyst: Robin Risko<br>
Mark Wolf

■ This analysis was prepared by nonpartisan House staff for use by House members in their deliberations, and does not constitute an official statement of legislative intent.