# Exhibit Q



*the* **WILLIAMS** INSTITUTE

MEMORANDUM

**From:**       Williams Institute

**Date**:       September 2009

**RE:**         **Michigan – Sexual Orientation and Gender Identity Law and Documentation of Discrimination**

### I.   OVERVIEW

Currently, Michigan has not enacted any statewide legislation prohibiting employment discrimination on the basis of sexual orientation and gender identity.[1]  The Michigan Civil Rights Act (hereinafter referred to as the "Elliott-Larsen Civil Rights Act"),[2] which prohibits employment discrimination based on various categories, including religion, race, and sex, does not prohibit discrimination based upon sexual orientation or gender identity.  Indeed, in *Barbour v. Department of Social Services*,[3]  the Michigan Court of Appeals held that harassment and discrimination based upon a person's sexual orientation is not an activity proscribed by the Elliott-Larsen Civil Rights Act.[4]  The *Barbour* court, however, did hold that a gender discrimination claim brought pursuant to the Elliott-Larsen Civil Rights Act may be based on incidents of homosexual advances that directly relate to the employee's gender.[5]  More recently, a bill was introduced in January 2007 to include "sexual orientation and gender identity or expression," but that bill did not go beyond the Judiciary Committee.[6]

Several executive orders issued between 2003 through 2007 prohibit employment discrimination based on sexual orientation and/or gender identity or expression, but are limited to protecting only state employees and do not provide for a private right of action.[7] Several municipalities in Michigan have passed ordinances banning employment practices, housing practices, and public accommodation practices that discriminate based on sexual orientation and gender identity.

---

[1] *See* Sarah Sprague, *Employment Discrimination Prevalent Issue for LGBTs*, MICH. DAILY, Apr. 4, 2005, http://bit.ly/BEHiL (illustrating the fear many members of the LGBT community experience when searching for a job, and once in the workplace, due to the lack of legal protection afforded LGBT employees under Michigan law).

[2] MICH. PUB. ACTS 453 (1976).

[3] 497 N.W.2d 216 (Mich. App. 1993).

[4] *Id.* at 217-18.

[5] *Id.* at 218.

[6] HB 4160 (Mich. 2007).

[7] Exec. Order No. 24 (2003); Exec. Order No. 24 (2007); and Exec. Order No. 22 (2008).

Documented examples of employment discrimination by government employers on the basis of sexual orientation and gender identity or expression in Michigan include:

- In 2008, a gay police officer reported that he was forced to resign because of his sexual orientation.[8]

- In 2007, a professor filed suit against the University of Michigan Law School for unlawfully denying him tenure based on his sexual orientation. He alleged that he was the first openly gay professor to be considered for tenure at the University of Michigan Law School, and the first man in the history of that institution to be denied tenure. He was denied tenure by a faculty vote, which at 18-12 in favor of tenure, fell two votes short of the 2/3 majority required by the school's rules. He had been recommended for tenure with a 4-1 vote from the tenure committee. His complaint alleges breach of contract, predicated on representations of non-discrimination during pre-employment negotiations, as well as University policies and by-laws prohibiting discrimination on the basis of sexual-orientation. Rather than building an affirmative case that no discrimination took place, the University's initial stance was to maintain that its by-laws and non-discrimination policies had no legal meaning and created no rights. The Law School filed motions for summary judgment were denied. The trial court ruled that the professor had established a legitimate claim of discrimination and that a trial on the merits was warranted.[9]

- In 2007, a lesbian corrections officer reported that she was forced to resign because of her sexual orientation.[10]

- In 2004, a public school teacher was terminated after telling students he was gay and had a partner. After the ACLU of Michigan wrote a letter to the school district demanding that the teacher be reinstated, the school district invited him back.[11]

- In 2002, in *Pettway v. Detroit Judicial Council*,[12] plaintiff, a court reporter, brought a lawsuit against his employer, supervisor, the Detroit Judicial Council and the City of Detroit alleging sexual orientation discrimination, retaliation, intentional infliction of emotional distress, and tortious interference with a business relationship.[13] Plaintiff brought this suit pursuant to the Detroit Human

---

[8] E-mail from Ken Choe, Senior Staff Attorney, American Civil Liberties Union, to Nan D. Hunter, Legal Scholarship Director, the Williams Institute (Feb. 26, 2009, 17:09:00 EST) (on file with the Williams Institute).

[9] LESBIAN & GAY L. NOTES (Oct. 2007).

[10] E-mail from Ken Choe, Senior Staff Attorney, American Civil Liberties Union, to Nan D. Hunter, Legal Scholarship Director, the Williams Institute (Feb. 26, 2009, 17:09:00 EST) (on file with the Williams Institute).

[11] *Docket: Discrimination*, ANNUAL UPDATE 39, 43(ACLU, 2004).

[12] No. 226616, 2002 WL 652125 (Mich. Ct. App. Apr. 19, 2002).

[13] *Id.* at *1.

Rights Ordinance.[14]  At trial, the trial court granted the employer's motion for summary judgment and held that the Human Rights Ordinance only applied to employees and that the plaintiff was a contractor.[15]  The Michigan Court of Appeals affirmed. <u>Pettway v. Detroit Jud. Council</u>, No. 226616, 2002 WL 652125 (Mich. Ct. App. Apr. 19, 2002).

- In 2000, the Michigan Supreme Court issued an opinion dismissing the claims of a Detroit police officer who had been subjected to discrimination and harassment. She alleged that after she was assigned to the sex crimes unit, numerous male officers began hitting on her for sexual favors. She declined, stating that she was a lesbian. She then suffered further discrimination, including being assigned away from law enforcement to busy-work desk jobs.  She also alleged that supervisors refused to handle her grievances because of her sexual orientation.  Ultimately, she retired from the police force and filed a lawsuit. The officer alleged that she was harassed after she rebuffed the advances of a supervisor because she is a lesbian, and that the consequent harassment violated the city charter's ban on sexual orientation discrimination. The trial judge granted the city's motion to dismiss the claim, finding that the charter provision did not provide a private right of action, and that the officers exclusive remedy was to file a discrimination complaint with the city's human rights agency.  However, the Court held that she could still  pursue a sex discrimination claim under the state's civil rights law. *Mack v. City of Detroit*, 243 Mich. App. 132 (Mich. Ct. App. 2000).

- In 1993 in *Barbour v. Department of Social Services,*[16] a Department of Social Services employee filed a lawsuit against its employer alleging sexual harassment and sexual discrimination in violation of the Michigan Civil Rights Act.  He alleged that throughout his employment his coworkers and the supervisor subjected him to unremitting verbal and nonverbal harassment based on his perceived sexual orientation.[17]  Specifically, plaintiff alleged that the various forms of harassment were made by coworkers and supervisor to get him to "come out of the closet . . . and to engage in homosexual sex. . . ."  At trial, the court determined, as an issue of first impression, that the Michigan Civil Rights Act's prohibition on sexual harassment does not include a proscription on discrimination or harassment "due to a person's sexual orientation or perceived sexual orientation."[18]  On appeal, the Michigan Court of Appeals upheld the trial court's ruling;[19] however, it also held that the employee could bring a gender discrimination claim pursuant to the Michigan Civil Rights Act based on incidents of homosexual advances that directly related to hir  gender.[20]  The court found that the supervisor's actions were directly related to plaintiff's status as a male,

---

[14] Detroit Code Ch. 27, Art. 3, §§ 3-1, 3-2.

[15] *Pettway*, No. 226616, 2002 WL 652125 at *1.

[16] 497 N.W.2d 216 (Mich. Ct. App. 1993).

[17] *Id.* at 217.

[18] *Id.*

[19] Mich. Comp. Laws 37.2101, *et seq.*

[20] *Id.*

and thus rendered the act applicable.[21]   <u>Barbour v. Dep't of Soc. Serv.</u>, 497 N.W.2d 216 (Mich. Ct. App. 1993).

- In 1993, Byron Center High School hired a teacher to revive its floundering music program.[22]  The teacher was a tenured music teacher described by many as one of the best teachers on staff and a good role model for students.[23]  Two years later in 1995, after he successfully revitalized the Center's music program, he and his partner planned for a commitment ceremony.[24]  Before the event took place, someone at the high school learned of the commitment ceremony and spread word to staff, parents and students.  At a school board meeting, a few angry parents demanded that the music teacher be fired.  The school board did not take immediate action, but issued a statement that said, "The board firmly believes that homosexuality violates the dominant moral standard of the district's community.  Individuals who espouse homosexuality do not constitute proper role models as teachers for students in this district" and warned the teacher that they would "investigate and monitor" the situation.[25]  In the months that followed the board meeting, many parents removed their children from the teacher's class and he became the center of media attention.  After a school official released the names and addresses of his students, parents received antigay letters and videos.  While he struggled to maintain his classroom for the remainder of the school year, he ultimately relented at the end of the school year and entered into a settlement agreement with the school district: he agreed not to sue or seek employment in the district in exchange for one-year's salary, health benefits and a letter of reference to leave the school district.[26]  Five months later, he collapsed, went into a coma and died days later at the age of thirty-two.  A forensic pathologist concluded that his died from a congenital malfunctioning heart valve,  adding that this condition was typically not fatal, but the stress from his public struggle may have contributed to his death.[27]

Part II of this memo discusses state and local legislation, executive orders, occupational licensing requirements, ordinances and polices involving employment discrimination based on sexual orientation and gender identity, and attempts to enact such laws and policies.  Part III discusses case law, administrative complaints, and other documented examples of employment discrimination by state and local governments against LGBT people.  Part IV discusses state laws and policies outside the employment context.

---

[21] *Id.*

[22] Christine Yared, *Where Are the Civil Rights for Gay and Lesbian Teachers,* 24 Hum. Rts. 3 (ABA 1997), *available at* http://www.abnet.org/irr/hr/yared.html.

[23] *Id.*

[24] Jill Smolowe, et al., *The Unmarrying Kind*, TIME, Apr. 29, 1996, *available at* http://www.time.com/time/printout/0,8816,984469.00.html; Yared, *supra* at Note 22.

[25] Yared, *supra* at Note 22.

[26] *Id.*

[27] *Id.*

## II.   SEXUAL ORIENTATION AND GENDER IDENTITY EMPLOYMENT LAW

### A.   State-Wide Employment Statutes

Currently the state of Michigan has not enacted laws to protect sexual orientation and gender identity from employment discrimination.[28]

### B.   Attempts to Enact State Legislation

Currently, the Michigan Civil Rights Act (hereinafter referred to as the "Elliott-Larsen Civil Rights Act") does not prohibit discrimination based upon sexual orientation or gender identity. Pending before the Michigan Legislature is House Bill 4160, which would add sexual orientation and gender identity or expression to Michigan's civil rights law.  The bill was introduced in January 2007 by Representative Steven Tobocman and currently has 19 cosponsors. The bill did not go beyond being referred to the Judiciary Committee.

### C.   Executive Orders, State Government Personnel Regulations & Attorney General Opinions

#### 1.   Executive Orders

Executive Order 2003-24:  Issued December 23, 2003, EO 2003-24 prohibits sexual orientation discrimination in hiring, recruiting, and other employment practices by any State department, board, commission, or other agency subject to supervision by the Governor under Section 8 of Article V of the Michigan Constitution of 1963.

Executive Directive 2007-24:  Issued November 21, 2007, ED 2007-24 protects employees in the State's executive branch from discrimination and harassment based on "gender identity or expression." The directive states, "[t]o build a more inclusive Michigan our state government must be a model of tolerance, accessibility, equal opportunity -- reaching out to people, knocking down barriers, and dispelling prejudices which hold Michigan back;…when the State of Michigan acts inclusively, the state benefits from the contribution and full participation of all Michiganians;… the employment practices of the State of Michigan should promote public confidence in the fairness and integrity of government, and should reflect a firm commitment to strengthening and developing equal employment opportunities;… state employment policies and procedures that encourage non-discriminatory and equal employment practices provide desirable models for the private sector and local governments and build upon successful policies and procedures of private and public sector employers." The directive adds "gender identity or expression" to a list of other prohibited forms of discrimination and harassment, including religion, race, color, national origin, age, sex, sexual orientation, height, weight, marital status, partisan considerations, disability and genetic information.

---

[28] MICH. PUB. ACT. NO. 453 (1976) (the "Elliott-Larsen Civil Rights Act").

The directive defines "gender identity or expression" as the "perception by an individual or another person of the gender identity, appearance, behavior, or expression of the individual whether or not that gender identity, appearance, behavior or expression is different from the gender identity, appearance, behavior or expression traditionally associated with the sex assigned to the individual at birth." Reporting requirements established by the Civil Service Commission and regulations established by the State Personnel Director relating to discriminatory harassment apply and, as provided in rules promulgated by the Civil Service Commission, an employee who engages in discriminatory harassment may be disciplined by the appointing authority, up to and including dismissal. Bona fide occupational qualifications and affirmative action plans may be authorized by an appointing authority within a department, board, commission or other agency if approved in advance by the State Personnel Director. Different standards for compensation or different terms, conditions, or privileges of employment under a bona fide seniority or merit system are also allowed.

Executive Order 2008-22:  Issued December 18, 2008, EO 2008-22 is based on the policy of the administration to "ensure equal access and opportunities in the recruitment, hiring, promotion, and retention of employees in the state's classified service without regard to … sexual orientation, gender identity or expression, … that is unrelated to the person's ability to perform the duties of a particular job or position." The Order provides for the creation of the State Equal Opportunity and Diversity Counsel that issues recommendations on equal opportunity measures.

## 2.  State Government Personnel Regulations

The following departments of the Michigan state government have non-discrimination policies that prohibit employment discrimination either on the basis of sexual orientation and/or gender identity and expression by state government employees: the Department of Human Services,[29] the Department of Civil Service,[30] and the Department of Human Services Bureau of Juvenile Justice.[31] The Equal Opportunity & Diversity Inclusion Advisory Committee is an advisory body to the Department of Human Services, which is committed to integrating the concept of diversity inclusion in the workplace and assuring equal opportunity for employees in all programs through collaboration with the offices of the department. Included in the committee's definition of diversity is sexual orientation.[32]

On March 17, 2006, the Michigan Commission On Services to the Aging held a meeting called "Arab Community Center for Economic & Social Services", where

---

[29] *Discriminatory Harassment*, AHJ 1305, AHB 2008-003 (June 1, 2008), *available at* http://www.mfia.state.mi.us/olmweb/ex/ahj/1305.pdf (last visited Sept. 6, 2009).

[30] Mich. Dep't Civ. Serv. Rule 1-8 (Prohibited Discrimination), *available at* http://bit.ly/Wo8sl; Mich. Dep't Civ. Serv. Regulation No. 1.03 (Investigating Reports of Discriminatory Harassment), *available at* http://bit.ly/AzFtr.

[31] Mich. Gov. Staff Ethics Rules, JR1 115, JRB 2007-001, (Nov. 11, 2007), *available at* http://www.mfia.state.mi.us/olmweb/ex/JR1/115.pdf (last visited Sept. 6, 2009).

[32] Powerpoint Presentation, Dep't of Hum. Serv., Equal Opportunity & Diversity Inclusion Advisory Comm., *available at* http://bit.ly/4zX0cn (last visited Sept. 6, 2009).

Commissioner Bollinger asked why "sexual orientation" is not a requirement within the Civil Rights compliance section of Statewide Service and Area Agency on Aging Operating Standards.  Eric Berke, a OSA staff member, explained that the State of Michigan Elliott-Larsen Civil Rights Act of 1976 and the Federal Civil Rights Act of 1964, Title VII specifically, did not include sexual orientation as a protected category.  As a result, "sexual orientation" is only a minimum expectation as reflected in current law or regulation.  Mr. Berke further stated that the Commission could include the reference if desired.  At that point, Commissioner Guilfoyle made a motion to include sexual orientation in the Area Agency on Aging Operating Standards and the service standards, Commissioner Bollinger seconded the motion, and the Commission unanimously voice-voted approval.[33]

### 3.   Attorney General Opinions

In a 1978 Attorney General Opinion on preemption, the Attorney General opined that municipalities and municipal human rights relations commissions are limited to performing education, counseling and advisory rules in the area of civil rights enforcement in the absence of an authorization from, or certification by, the State Civil Rights Commission for the performance of further functions.  The Attorney General opines that the Detroit Charter, Art. 7, Ch 10, Sec. 7-1004(1), which protects against sexual orientation in addition to other bases of discrimination that are state recognized, is in direct conflict with the State Civil Rights Commission rules.

### 4.   Local Ordinances

A number of cities in Michigan have anti-discrimination policies that prohibit discrimination on the basis of sexual orientation and/or gender identity, including Ann Arbor,[34]  Lansing,[35]  Ferndale,[36]  Flint,[37]  Grand Rapids,[38]  Lansing,[39]  Ypsilanti,[40] Saugatuck Township,[41]  Spring Lake,[42] and Westland.[43]

Detroit has a number of ordinances prohibiting sexual orientation discrimination in employment.  Specifically, these ordinances are geared toward (1) employers and

---

[33] Minutes of the Meeting of the Comm'n on Serv. to the Aging (Feb. 17, 2006), *available at* http://bit.ly/bwpIn (last visited Sept. 6, 2009).

[34] *See* ANN ARBOR CODE Ch. 112, §§ 9:150 to 9:164 (1995) (specifically banning discrimination in employment at § 9:155).

[35] *See* EAST LANSING CODE Ch. 22, Art. II, §§ 22-31 to 22-22-39 (specifically banning discrimination in employment at §22-33).

[36] FERNDALE CODE Ch. 28, §§ 28-1 to 28-6.

[37] CITY OF FLINT, MICH. CODE, Part II, Ch. 2, Art. IV, § 2-19.2(a).

[38] CITY OF GRAND RAPIDS, MICH. CODE , Part 2, Ch. 8, Art. 3, § 1.347.

[39] LANSING CODE Part 2, Title 12, Ch. 297, §§ 297.01 to 297.15.

[40] YPSILANTI CODE Ch. 58, Art III, Div. 1, §§ 58-61 to 58-75; *Id.* at Ch. 2, Art. VI, Div. 3, §§ 2-316 to 2-329 (Affirmative Action program that applies to city contractors); *Id.* at Ch. 58, Art II, §§ 58-31 to 58-39 (Human Relations Commission).

[41] Art. V, Sec. 2-251 to 2-258 (Ord. No. 2007-02, §§ 2-9, 8-2-2007).

[42] Art. XVII, Sec. 17.02.

[43] Art. 2, Sec. 54-39 (Code 1981, § 11-27; Ord. No. 194-A-2, § 2, 11-15-04).

contractors with the City;[44] (2) the City's Human Resources Department;[45] and (3) housing commission employment practices.[46] The City also has a Home Rule Charter that declares, as a right for the citizens of the City, that the City has an affirmative duty to secure the equal protection of the law for all persons, and states that no person shall be denied the enjoyment of civil or political rights, or be discriminated against in the exercise thereof, because of race, color, creed, national origin, age, handicap, sex, or sexual orientation.[47] In addition, Detroit has enacted ordinances creating a general human rights commission, which is dedicated to eliminating sexual orientation discrimination.[48] The human rights commission is vested with the power and the general jurisdiction, both inside and outside of city government, to approve of procedures to remedy past effects of discrimination and to prevent discrimination "in education, employment, medical care facilities, housing accommodations, commercial space, places of public accommodation, public service, resort or amusement, or other forms of discrimination prohibited by law, based upon …sexual orientation; and to take such action as necessary to secure the equal protection of civil rights."[49]

D. **Occupational Licensing Requirements**

Michigan Complied Laws § 339.101, *et seq.* ("Occupational Code") consolidates and reclassifies the laws regarding the regulation of certain occupations and creates a board for each occupation and procedures for licensing. A non-exhaustive search of websites has found no occupational licensing requirements that reference "moral turpitude" or similar allusions that could include sexual orientation or gender identity.

---

[44] DETROIT CODE Ch. 27, Art. 3, §§ 3-1, 3-2.

[45] *Id.* at Part I, Art 6, Ch. 5, § 6-506.

[46] *Id.* at Ch. 14, Art. 5, § 5-3(d).

[47] *Id.* at Part I, Preamble, § 2.

[48] *See Id.* at Ch. 27, Art. 1, § 1-1.

[49] *See generally*, DETROIT CODE Ch. 27, Art. 1-3.

### III.   DOCUMENTED EXAMPLES OF EMPLOYMENT DISCRIMINATION AGAINST LGBT PEOPLE BY STATE & LOCAL GOVERNMENTS

####    A.   Case Law

#####      1.   State & Local Government Employees

<u>Pettway v. Detroit Jud. Council</u>, No. 226616, 2002 WL 652125 (Mich. Ct. App. Apr. 19, 2002).

In *Pettway v. Detroit Judicial Council*,[50] plaintiff, a court reporter, brought a lawsuit against his employer, supervisor, the Detroit Judicial Council and the City of Detroit alleging sexual orientation discrimination, retaliation, intentional infliction of emotional distress, and tortious interference with a business relationship.[51]   Plaintiff brought this suit pursuant to the Detroit Human Rights Ordinance.[52]   At trial, the trial court granted plaintiff's employer and supervisor summary judgment and held that the Human Rights Ordinance only applied to employers.[53]   Plaintiff challenged this holding on appeal and the Michigan Court of Appeals upheld the trial court's ruling that the ordinance applied strictly to employers.[54]

<u>Mack v. City of Detroit</u>, 243 Mich. App. 132 (Mich. Ct. App. 2000).

Linda Mack was a Detroit police officer, who had advanced to the rank of lieutenant. She claimed that because she rebuffed sexual advances by several male supervisors, she was subjected to discrimination and mistreatment. Mack argued that she rebuffed these advances because she is a lesbian, and that the consequent harassment violated the city charter's ban on sexual orientation discrimination. The trial judge granted the city's motion to dismiss the claim, finding that the charter provision did not provide a private right of action, and that Mack's exclusive remedy was to file a discrimination complaint with the city's human rights agency. On appeal, the Michigan Court of Appeals found that the city charter did not support the contention that the administrative remedy was exclusive, holding that there is an implied right of action under the Detroit city charter provision that bans sexual orientation discrimination. The case was appealed to the Michigan Supreme Court, which reversed the appellate court, holding that Mack cannot enforce her rights under the Detroit City Charter to be free of sexual orientation discrimination in the workplace by suing the city and its police department in state court.  However, Mack is still entitled to pursue a sex discrimination claim under the state's civil rights law.

Mack alleged that when she was assigned to the sex crimes unit, numerous male officers began hitting on her for sexual favors. When she declined, stating that she was a lesbian, she suffered further discrimination, including being assigned away from law

---

[50] No. 226616, 2002 WL 652125 (Mich. Ct. App. Apr. 19, 2002).

[51] *Id.* at *1.

[52] DETROIT CODE Ch. 27, Art. 3, §§ 3-1, 3-2.

[53] *Pettway*, No. 226616, 2002 WL 652125 at *1.

[54] *Id.* at 2.

enforcement to busy-work desk jobs.  She also alleged that supervisors refused to handle her grievances because of her sexual orientation.  Ultimately, she retired from the police force and filed a lawsuit.

The Supreme Court held that the fatal flaw in Mack's claim is that although Detroit amended its charter years before to ban sexual orientation discrimination, Michigan had not added that category to the state's civil rights law.  According to the majority, Mack's suit for sexual orientation discrimination, which was based solely on the city charter provision, was not within the jurisdiction of the state courts because the city does not have authority to enact exceptions to the Michigan Government Tort Liability Act (GTLA), which provides that, apart from some listed exceptions, government agencies in Michigan are immune from tort liability when "engaged in the exercise or discharge of a governmental function."[55]

Barbour v. Dep't of Soc. Serv., 497 N.W.2d 216 (Mich. Ct. App. 1993).

In *Barbour v. Department of Social Services,*[56] a Department of Social Services employee filed a lawsuit against its employer alleging sexual harassment and sexual discrimination in violation of the Michigan Civil Rights Act, MICH. COMP. LAWS 37.2101, *et seq.*  The plaintiff held that throughout his employment with defendant, his coworkers and supervisor subjected him to unremitting verbal and nonverbal harassment based on his perceived sexual orientation.[57]  Specifically, plaintiff alleged that the various forms of harassment were made by coworkers and supervisor to get him to "come out of the closet . . . and to engage in homosexual sex. . . ."  At trial, the court determined, as an issue of first impression, that the Michigan Civil Rights Act's prohibition on sexual harassment does not include a proscription on discrimination or harassment "due to a person's sexual orientation or perceived sexual orientation."[58]  The trial court granted defendants summary judgment.

On appeal, the Michigan Court of Appeals upheld the trial court's ruling regarding the application of the Michigan Civil Rights Act.[59]  The appellate court stated that the plaintiff failed to show the alleged harassment by his coworkers was gender-based, noting that plaintiff's deposition indicated his own relief that the harassment was the result of his co-workers perceptions of his sexual orientation.[60]  The appellate court found, however, that the lower court erred in dismissing plaintiff's complaint insofar as it alleged specific homosexual advances directed to him by his supervisor.  In particular, the court held that a gender discrimination claim brought pursuant to the Michigan Civil Rights Act may be based on incidents of homosexual advances that directly relate to the

---

[55] *Mack v. City of Detroit*, 243 Mich. App. 132 (Mich. Ct. App. 2000).
[56] 497 N.W.2d 216 (Mich. Ct. App. 1993).
[57] *Id.* at 217.
[58] *Id.*
[59] MICH. COMP. LAWS 37.2101, *et seq.*
[60] 497 N.W.2d at 218.

employee's gender.[61]   The court found that the supervisor's actions were directly related to plaintiff's status as a male, and thus rendered the act applicable.[62]

### 2.    Private Employees

Robinson v. Ford Motor Co., 744 N.W.2d 363 (Mich. Ct. App. 2008).

In *Robinson v. Ford Motor Company*,[63] the plaintiff brought a sexual harassment claim against his employer pursuant to the Michigan Civil Rights Act, alleging that a male coworker sexually harassed him while they both worked in defendant's manufacturing plant.   Specifically, the plaintiff alleged that the coworker engaged in a variety of conduct unwelcomed by him and other employees that constituted sexual harassment.

With regard to plaintiff, the alleged conduct included the coworker slapping him on the buttocks, pinching his nipples, pulling down plaintiff's pants to expose his underwear, the coworker exposing his testicles to another coworker while grasping plaintiff's hand and attempting to or actually making plaintiff touch them, and placing his hands in plaintiff's pants and placing his finger between plaintiff's buttocks.   The coworker also allegedly offered to show plaintiff his penis and asked plaintiff about the size of plaintiff's penis.   Additionally, the coworker allegedly made comments about wanting to see plaintiff's "naked butt" in a vat of K-Y Jelly and wanting to "crack [plaintiff's] ass."   On several occasions, the coworker told plaintiff, "You're my bitch, I own your ass."   Plaintiff alleged that he suffered a breakdown after two consecutive days in which the coworker digitally penetrated plaintiff's mouth.   Plaintiff testified in his deposition that he could feel the coworker's erect penis on his back during one of these incidents.   Plaintiff reported these and other incidents to his supervisor.[64]

The Court of Appeal held that: (1) the language of the Michigan Civil Rights Act did not exclude same-gender harassment claims; and (2) the employee presented sufficient evidence to allow a reasonable trier of fact to conclude that the coworkers' conduct and communication inherently pertained to sex for the purposes of the employee's same-gender sexual harassment claim under Michigan Civil Rights Act.

The Court further noted that, consistent with the United States Supreme Court's holding in *Oncale*,[65] it interpreted the Michigan Civil Rights Act to present a threshold question: "whether the same-gender harasser's conduct constituted discrimination

---

[61] *Id.*

[62] *Id.*

[63] 744 N.W.2d 363 (Mich. Ct. App. 2008).

[64] *Id.* at 366.

[65] In *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1998), the United States Supreme Court held that "sex discrimination consisting of same-sex sexual harassment is actionable under title VII.  The Court further held that title VII's prohibition against sexual discrimination included sexual harassment of any kind that meets the statutory requirements.  The Court also held that discrimination on the basis of sex can be inferred in cases where there is "credible evidence that the harasser was homosexual."  The Court did not address the issue of the victim's sexual orientation or perceived sexual orientation.

because of sex."[66]   The Court remanded the case for determination as to whether there was sufficient evidence to establish that the coworker acted out of sexual desire when harassing plaintiff or that the coworker was motivated by a general hostility toward the presence of men in the workplace; and whether there was direct comparative evidence about how the coworker treated members of both genders in a mixed-gender workplace. The Court failed to identify any evidentiary routes that plaintiff took to establish his same-gender sexual harassment claim.[67]

> Brewer v. Hill, No. 208872, 2000 Mich. App. LEXIS 1033 (Mich. Ct. App. Sept. 15, 2000).

In *Brewer v. Hill*,[68] plaintiff, a paralegal, filed a lawsuit against his employer alleging breach of employment contract as well as sexual and racial discrimination and harassment in violation of the Michigan Civil Rights Act.[69]  Specifically, plaintiff alleged defendant derogatorily referred to plaintiff as a homosexual and called him "gay," "faggot," "fairy," "president of the Downriver Fairies Club," and "half-breed" in front of coworkers and clients.[70]   Plaintiff also presented evidence that women in his workplace were not subject to the same harassment based on perceived sexual orientation.[71]   The trial court granted defendant's motion for directed verdict, reversing a jury's verdict in plaintiff's favor.[72]

The Michigan Court of Appeals upheld the trial court's ruling, holding that the name calling plaintiff endured from the lawyer for whom he worked was not enough to establish a violation of the Michigan Civil Rights Act, because this evidence was insufficient to demonstrate that the harassment was actually based on gender.  The Court of Appeals held that "the mere fact that defendant Hill did not demean the women in his office by questioning their sexuality does not establish that, but for the fact of plaintiff's sex, plaintiff would not have been the object of harassment."[73]

### B.   Administrative Complaints

None.

### C.   Other Documented Examples of Discrimination

Municipal Police Department

---

[66] *Id*. at 369-70 (internal quotations and citations omitted).

[67] *Id*. at 370.

[68] No. 208872, 2000 Mich. App. LEXIS 1033 (Mich. Ct. App. Sept. 15, 2000).

[69] *Id.* at *1.

[70] *Id.* at *2 and *15, n.6.

[71] *Id.* at *16.

[72] *Id.* at *2.

[73] *Id*. at *16.

In 2008, a gay police officer reported that he was forced to resign because of his sexual orientation.[74]

### The University of Michigan-Ann Arbor

In 2007, Professor Peter Hammer filed suit against the University of Michigan Law School for unlawfully denying him tenure based on his sexual orientation. Professor Hammer alleged that he was the first openly gay professor to be considered for tenure at the University of Michigan Law School, and the first man in the history of that institution to be denied tenure. Hammer was denied tenure by a faculty vote, which at 18-12 in favor of tenure, fell two votes short of the 2/3 majority required by the school's rules. Hammer had been recommended for tenure with a 4-1 vote from the tenure committee.

The complaint alleges breach of contract, predicated on representations of non-discrimination during pre-employment negotiations, as well as University policies and by-laws prohibiting discrimination on the basis of sexual-orientation. Rather than building an affirmative case that no discrimination took place, the University's initial stance was to maintain that its by-laws and non-discrimination policies had no legal meaning and created no rights.

The Law School filed two Motions for Summary Disposition that were denied. The trial court ruled that Hammer had established a legitimate claim of discrimination and that a trial on the merits was warranted.[75]

### Correctional Facility

In 2007, a lesbian corrections officer reported that she was forced to resign because of her sexual orientation.[76]

### Byron Center Public School

In 1993 Byron Center High School hired Gerry Crane to revive its floundering music program.[77] Crane was a gay, tenured music teacher described by many as one of the best teachers on staff and a good role model for students.[78] Two years later in 1995, after Crane successfully revitalized the Center's music program, Crane and his partner Randy Block planned for a commitment ceremony.[79] Before the event took place, someone at the Center learned of the commitment ceremony and spread word to staff, parents and students. At a school board meeting, a few angry parents demanded that

---

[74] E-mail from Ken Choe, Senior Staff Attorney, American Civil Liberties Union, to Nan D. Hunter, Legal Scholarship Director, the Williams Institute (Feb. 26, 2009, 17:09:00 EST) (on file with the Williams Institute).

[75] LESBIAN & GAY L. NOTES (Oct. 2007).

[76] E-mail from Ken Choe, Senior Staff Attorney, American Civil Liberties Union, to Nan D. Hunter, Legal Scholarship Director, the Williams Institute (Feb. 26, 2009, 17:09:00 EST) (on file with the Williams Institute).

[77] Yared, *supra* at Note 22.

[78] *Id.*

[79] Jill Smolowe, et al., *The Unmarrying Kind*, TIME, Apr. 29, 1996, *available at* http://www.time.com/time/printout/0,8816,984469.00.html; Yared, *supra* at Note 22.

Crane be fired.  The school board did not take immediate action, but issued a statement that said, "The board firmly believes that homosexuality violates the dominant moral standard of the district's community.  Individuals who espouse homosexuality do not constitute proper role models as teachers for students in this district" and warned Crane that they would "investigate and monitor" the situation.[80]  In the months that followed the board meeting, many parents removed their children from Crane's class and Crane became the center of media attention.  After a school official released the names and addresses of Crane's students, parents of Crane's students received antigay letters and videos.  While Crane struggled to maintain his classroom for the remainder of the school year, Crane ultimately relented at the end of the school year and entered into a settlement agreement with the school district: he agreed not to sue or seek employment in the district in exchange for one-year's salary, health benefits and a letter of reference to leave the school district.[81]  Five months later, Crane collapsed, went into a coma and died days later at the age of thirty-two.  A forensic pathologist concluded that his died from a congenital malfunctioning heart valve.  The pathologist added that this condition was typically not fatal, but the stress from his public struggle may have contributed to his death.[82]

<u>Michigan Public School</u>

In 2004, A public school teacher was terminated after telling students he was gay and had a partner.  After the ACLU of Michigan wrote a letter to the school district demanding that the teacher be reinstated, the school district invited him back.[83]

---

[80] Yared, *supra* at Note 22.
[81] *Id.*
[82] *Id.*
[83] *Docket: Discrimination*, ANNUAL UPDATE 39, 43(ACLU, 2004).

## IV. NON-EMPLOYMENT SEXUAL ORIENTATION & GENDER IDENTITY RELATED LAW

In addition to state employment law, the following areas of state law were searched for other examples of employment-related discrimination against LGBT people by state and local governments and indicia of animus against LGBT people by the state government, state officials, and employees. As such, this section is not intended to be a comprehensive overview of sexual orientation and gender identity law in these areas.

### A. Criminalization of Same-Sex Sexual Behavior

Although Michigan has adopted modern criminal sexual conduct laws based upon the Model Penal Code,[84] the legislature still has not repealed the old sodomy[85] and gross indecency statutes,[86] which criminalize homosexual behavior.

### B. Housing & Public Accommodations Discrimination

No state housing regulations exists that addresses sexual orientation discrimination or gender identity discrimination. However, a number of local jurisdictions have passed ordinances prohibiting sexual orientation or gender identity discrimination in housing and public accommodations, including Ann Arbor,[87] Douglas,[88] East Lansing,[89]  Ferndale,[90] Lansing,[91] Saugatuck Township in Allegan County,[92] Spring Lake,[93] Westland, [94] Dearborn Heights, [95] West Bloomfield (master cable services only), [96] Port Huron (taxi services only)[97] Birmingham (real estate transactions).[98]

On December 1, 2008, the Commission for the City of Kalamazoo voted 7-0 to adopt an expanded human rights ordinance that makes it illegal to use sexual orientation to discriminate in housing, public accommodations, and employment.  The new ordinance went into effect December 11, 2008, but on January 13, 2009, the City

---

[84] MICH. COMP. LAWS § 750.520 *et seq.*

[85] *Id.* at § 750.158.

[86] *Id. at* § 750..338a (1952) (male indecency)  and  § 750.338a. (female indecency).

[87] See ANN ARBOR CODE Ch. 112, §§ 9:150 to 9:164 (1995) (Ord. No. 4-78, 3-13-78; Ord. No. 10-99, § 1, 3-1-99).

[88] CITY OF THE VILLAGE OF DOUGLAS, MICH. CODE, Tit. IX, Ch. 91, § 91.01, *et seq.*

[89] See Art II, §§ 22-31 to 22-22-39; (Ord. No. 977, Ch. 111, §§ 9.301 to 9.308, 3-19-2002; Ord. No. 1127, 10-18-2005).

[90] Ch. 28, §§ 28-1 to 28-6 (Ord. No. 1016, Pt. I, 11-7-06).

[91] Ch. 297 §§ 297.01 to 297.15 (Ord. No. 1120, § 1, 12-18-06).

[92] Art. V, Sec. 2-251 to 2-258 (Ord. No. 2007-02, §§ 2-9, 8-2-2007).

[93] Art. XVII, Sec. 17.02.

[94] Art. 2, Sec. 54-39 (Code 1981, § 11-27; Ord. No. 194-A-2, § 2, 11-15-04).

[95] § 2-581 (Ord. No. H-05-03, § I, 10-11-05)

[96] Art. XIII, Div. 1, Sec. 9-278 (Ord. No. C-591, Art. 15, 9-18-00).

[97] Art. XIII, Div. 1, § 12-606 (Code 1975, § 36-21; Code 1992, § 18-331; Ord. No. 1175, 7-10-2000).

[98] §§ 66-36 (Code 1963, § 9.132; Ord. No. 1520, § 9.132, 4-27-92; Code 1963, § 9.134; Ord. No. 1520, § 9.134, 4-27-92).

Commission unanimously repealed the ordinance after opponents, lead by the American Family Association of Michigan, collected enough signatures to put the ordinance up for a public vote.

The City of Detroit has a number of ordinances prohibiting sexual orientation discrimination: (1) in real estate, insurance and loan practices;[99] (2) by employers and contractors with city;[100] (3) in policing and other immigration status checks;[101] (4) in educational institutional practices;[102] (5) in public accommodation practices;[103] (6) by the City's Human Resources Department;[104] (7) in housing commission applications and employment practices.[105]

### C.   Hate Crimes

Michigan law requires local police agencies to report crimes "motivated by prejudice or bias based on race, ethnic origin, religion, gender or sexual orientation."[106]

Michigan's Ethnic Intimidation Act, the State's hate-crimes law, does not include "sexual orientation" protections, creating an anomaly in which police are required to report a "crime" which is not classified as a crime under state law.[107] As originally drafted and proposed, Michigan's statute included "sexual orientation" as one of the proscribed motivations. This provision, however, was dropped in a legislative compromise to secure the passage of the remainder of the bill.[108] Attempts to amend the Act in order to reinstate the sexual orientation protection began almost immediately and are currently an annual event in the Michigan Legislature.

### D.   Education

Michigan has a general "Statewide school safety information policy", which provides requirements that a school must follow when instances take place at schools that require law enforcement intervention.[109] However, there is no specific legislation protecting transgender, gay, or lesbian students from discrimination or harassment. Senate Bill 0159 seeks to prohibit harassment or bullying of a student based on the student's actual or perceived distinguishing characteristics. Protected characteristics include sexual orientation and gender identity. The bill was referred to the Committee on Education on January 29, 2009.

---

[99] (Ord. No. 303-H, § 1(2-7-4), 1-24-79; Ord. No. 330-H, § 1, 6-27-79).

[100] (Ord. No. 303-H, § 1(2-7-3), 1-24-79; Ord. No. 330-H, § 1, 6-27-79).

[101] (Ord. No. 10-07, § 1, 5-9-07).

[102] (Ord. No. 330-H, § 1(2-7-5), 1-24-79).

[103] (Ord. No. 330-H, § 1, (2-7-6), 1-24-79; Ord. No. 303-H, § 1, 6-27-79).

[104] (Art. 6, Ch. 5, Sec. 6-506).

[105] (Code 1964, § 2-7-13; Ord. No. 5-95, § 1, 4-12-95; Ord. No. 12-01, § 1, 9-17-01; Ord. No. 15-01, § 1, 9-26-01; Ord. No. 05-06, § 1, 2-17-06).

[106] *Id.* at §§ 28.251 and 28.257a (1992).

[107] *Id.* at § 750.147b (1989).

[108] Senate Fiscal Agency, First Analysis of HB 4113 (Substitute S-2), (1987-1988).

[109] MICH. COMP. LAWS SERV. § 380.1308 (1999).

The Michigan Career and Technical Institute ("MCTI"), through the Department of Energy, Labor & Economic Growth, conducts vocational and technical training programs and provide the supportive services needed to prepare Michigan citizens with disabilities for competitive employment.  The MCTI has a policy under its Ethical Code of Conduct to provide appropriate services to students regardless of … sexual orientation.[110]

The School District of the City of Ferndale (which also encompasses Pleasant Ridge, Royal Oak Township and part of Oak Park), the Wayne-Westland School District (later repealed in August 1997), and Plymouth-Canton High School all protect students and staff from discrimination based on sexual orientation.  The Berkley Education Association has forbidden such discrimination against teachers by contract since 1993.[111]

E.    **Health Care**

Michigan law does not specifically allow for a partner to make medical decisions on behalf of his/her incapacitated same-sex partner (though a legal guardian may make such decisions).[112]  An adult may appoint a patient advocate to make medical decisions on his/her behalf.[113]

The Michigan Public Health Code requires Nursing Homes to "certify . . . that all phases of operation, including its training program, are without discrimination against persons or groups of persons on the basis of . . . sexual orientation."[114]  This language protects both residents and staff.  In addition, the code prohibits denial of care on the basis of sexual preference.[115]

Michigan prohibits all persons working in psychology, [116] social work, [117] and sanitarians, [118] in the Department of Community Health, from engaging in harassment or unfair discrimination on a number of bases, including gender identity and sexual orientation.

F.    **Gender Identity**

---

[110] MCTI ETHICAL CODE Policy No. 62 ( 2005), *available at* http://bit.ly/bqwWO.

[111] Serra, *supra* note 153, at 948.

[112] MICH. COMP. LAWS ANN. § 333.5653 (2005).

[113] MICH. COMP. LAWS ANN. § 700.5506 (2008).

[114] MICH. COMP. LAWS § 333.21761(1) (1998).

[115] *Id.* at § 333.20201(2)(a) (2006).

[116] MICHIGAN ADMIN. CODE, Rule 3383.2515 Rule 15, Dep't of Community Health, Director's Office, Psychology.

[117] MICHIGAN ADMIN. CODE, Rule 3383.2909 Rule 9, Dep't of Community Health, Director's Office, Social Work.

[118] MICHIGAN ADMIN. CODE, Rule 3383.3910 Rule 10, Dep't of Community Health, Director's Office, Advisory Committee on Sanitarians Registration.

Michigan law provides that a transsexual individual born in Michigan may obtain a new birth certificate with a physician's affidavit certifying that sex-reassignment surgery has been performed.[119]

### G.   Parenting

Michigan allows any adult or married couple to petition to adopt.[120]

In *Boot v. Boot*,[121] the court considered the plaintiff's mother's same-sex relationship as evidence regarding moral fitness.

### H.   Recognition of Same-Sex Couples

#### 1.   Marriage, Civil Unions & Domestic Partnership

On November 2, 2004, Michigan voters approved Proposal 04-2, adding Article 1, Section 25 to Michigan's Constitution.  The amendment reads: "To secure and preserve the benefits of marriage of our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose."[122]

In 2004, the Attorney General opined that a marriage contracted between persons of the same sex in a state that recognizes same-sex marriages is not valid in the State of Michigan.[123]  In that same opinion, the Attorney General also opined that couples of the same sex who marry in a state that recognizes same-sex marriages as valid are not legally authorized to adopt children in Michigan as a couple.  One member of a same-sex couple may adopt a child in Michigan as a single person.

Since 1996, marriage is described in MICH. COMP. LAWS 551.1 as "inherently a unique relationship between a man and a woman.  As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children.  A marriage contracted between individuals of the same sex is invalid in this state."  Furthermore, MICH. COMP. LAWS 551.272 provides that "marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction."

The City of Ann Arbor has a domestic partnership ordinance that recognizes families that are based on committed relationships apart from marriages, including those comprised of lesbians, gay males, bisexual persons, or heterosexuals.[124]

---

[119] MICH. COMP. LAWS ANN. § 333.2831(c) (1997).
[120] MICH. COMP. LAWS ANN. § 710.24 (2004).
[121] 2001 WL 766115 (Mich. App. Ct. 2001).
[122] Mich. Const. 1963, Art. I, § 25.
[123] Mich. Att'y Gen. Op. No. 7160, 2004 WL 2096457 (2004).
[124] ANN ARBOR CODE Ch. 110, §§ 9:85-9:95 (Ord. No. 62-91, § 1, 11-4-91).

2.    **Benefits**

In March 2005, Michigan Attorney General Mike A. Cox issued an opinion, stating that, based on the recent Michigan Constitutional Amendment recognizing marriage only between a man and a woman, no city in Michigan may continue offering same-sex benefits when it renews contracts for its municipal employees.[125]

In *American Family Association of Michigan v. Michigan State University Board of Trustees*,[126] a nonprofit corporation brought action against Michigan State University, its board of trustees, and other associated entities, challenging defendants' policy of providing benefits to same-sex domestic partners. Plaintiff alleged that the policy constituted an illegal expenditure of state funds to define and recognize same-sex domestic partnerships in violation of the State Constitution and state law.  The Court of Appeals held that: (1) the corporation lacked standing to bring lawsuit, and (2) the lawsuit, brought pursuant to the statute permitting actions to prevent illegal expenditure of state funds to test constitutionality of a statute relating thereto, was not tantamount to a qui tam action challenging unlawful expenditures.[127]

The City of Kalamazoo, in accordance with its Domestic Partner Benefits Policy, previously provided insurance and other benefits to the same-sex "domestic partners" of City employees "identical to those provided to spouses of City employees."  However, after the Attorney General issued its opinion that this policy violated the Constitutional Amendment limiting marriage to opposite-sex couples in 2005, and the Michigan Court of Appeals ruled that providing such benefits violated the state Constitutional Amendment defining marriage as between one man and one woman in 2007, the City repealed this ordinance.[128]

In *National Price at Work, Inc. v. Governor of Michigan*,[129] a union constituency group and various public employees and their respective same-sex domestic partners brought action against the Governor of Michigan and the City of Kalamazoo, seeking declaratory judgment that the marriage amendment did not preclude public employers from extending benefits to same-sex domestic partners.[130]   A unanimous three-judge panel of the state Court of Appeal ruled that the amendment bans domestic partner benefit plans.

J.    **Other Non-Employment Sexual Orientation & Gender Identity Related Laws**

1.    **Judicial Ethics**

---

[125] Mich. Att'y Gen. Op. No. 7171, 2005 WL 639112(2005).

[126] 739 N.W.2d 908 (Mich. App. Ct. 2007).

[127] *Id.*

[128] David Eggert, *Kalamazoo No Longer Will Provide Health Benefits to Gay Partners*, A.P., June 4, 2007, *available at* http://bit.ly/3U2TqN (last visited Sept. 6, 2009).

[129] 732 N.W.2d 139 (Mich. 2007).

[130] *Id.*

When the Representative Assembly of the State Bar of Michigan approached the subject of judges' membership in discriminatory organizations, it failed to take a firm stance against the involvement of judges in such organizations.  The proposed MCJC Canon 2C stated: "A judge should not hold membership in any organization which the judge knows invidiously discriminates on the basis of race, religion, disability, age, sexual orientation, gender, or ethnic origin."  The adopted MCJC Canon 2E states: "A judge should be particularly cautious with regard to membership activities that discriminate, or appear to discriminate, on the basis of race, gender, other protected personal characteristic."[131]

### 2.    Government Contracting: Local Ordinances Prohibiting Discrimination

The cities of Detroit, Grand Rapids, Ann Arbor, East Lansing, Flint and Birmingham, as well as the Village of Douglas, have ordinances forbidding sexual orientation discrimination in contracting.[132]  Ferndale, Michigan now does, as well.[133]

### 3.    Loans

Michigan provides that loans are available to all eligible borrowers without regard to race, color, sex, creed, religion, disability, sexual orientation, national origin, age, or marital status.[134]

---

[131] Mich. Ethics Op. No. JI-75, 1993 WL 566226 (1993).

[132] Rudy Serra, *Sexual Orientation and Michigan Law*, 76 MICH. B.J. 948, 948 (1997).

[133] 19 MICH. EMPL. L. LETTER 10 (Dec. 2008).

[134] MICH. ADMIN. CODE R. 390.1603 Rule 3 (Department of Treasury, Michigan Higher Education Student Loan Authority, Federal Family Education Loan Program (FFELP)).