UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA BASSETT, CAROL KENNEDY,
PETER WAYS, JOE BREAKEY, JOLINDA
JACH, BARBARA RAMBER, DOAK BLOSS,
GERARDO ASCHERI, MICHELLE JOHNSON,
and DENISE MILLER,

                Plaintiffs,                      Case Number 12-10038
                                                          Honorable David M. Lawson

v.

GOVERNOR RICHARD SNYDER,

                Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING PERMANENT INJUNCTION

On December 22, 2011, defendant Richard Snyder, Michigan's governor, signed into law the Public Employee Domestic Partner Benefit Restriction Act, Public Act 297 (2011), which prohibited local units of government from continuing to furnish health care and other fringe benefits to the domestic partners of their employees. The plaintiffs, five same-sex couples with one partner employed by a local municipality or school district that provided such fringe benefits to same-sex domestic partners, filed the present action to declare that Act 297 violates the Federal Constitution and to enjoin its enforcement. After a hearing and extensive briefing, I issued a preliminary injunction on June 28, 2013 preventing the defendant from enforcing Act 297. The State of Michigan did not appeal that order, and the injunction remains in effect.

The parties now have filed cross motions for summary judgment. The plaintiffs argue that Act 297 is nothing more than a mean-spirited attempt to deny health care benefits to the same-sex domestic partners of public employees on the basis of their sexual preference, and therefore the law

violates the Equal Protection Clause of the Fourteenth Amendment.  Governor Snyder argues that the law is rationally related to legitimate governmental purposes, and therefore satisfies the deferential standard of review that allows such classification.  When issuing the preliminary injunction, I found that the "primary purpose" of Act 297 was "to deny health benefits to the same-sex partners of public employees," and that "'can never be a legitimate governmental purpose.'"  *Bassett v. Snyder*, 951 F. Supp. 2d 939, 969 (E.D. Mich. 2013) (quoting *Davis v. Prison Health Services*, 679 F.3d 433, 438 (6th Cir. 2012)).  The defendant has failed to argue convincingly otherwise here.  Therefore, I will grant the plaintiffs' motion for summary judgment, deny the defendant's motion for summary judgment, and enter a permanent injunction prohibiting the enforcement of Public Act 297.

## I.

Since the injunction was issued, there has been a new development.  This district court declared that Michigan's marriage amendment (which prohibits same-sex marriage) violated the Equal Protection Clause because there was no rational basis for the State to deny the benefits of marriage to same-sex couples.  The Sixth Circuit reversed that decision, holding that states "retain authority" to regulate marriage by classifying who may marry; and if same-sex couples are denied that right, they can find no comfort in the Federal Constitution.  *DeBoer v. Snyder*, --- F.3d ----, 2014 WL 5748990, at *11 (6th Cir. Nov. 4, 2014).

But this case is not about marriage, as such, although allowing same-sex couples to marry would go a long way toward minimizing the discriminatory sting of the Public Employee Domestic Partner Benefit Restriction Act.  Rather, this case deals with couples who cannot marry under state law and their families.  It is one thing to say that states may cleave to the traditional definition of

marriage as a means of encouraging biologically complimentary couples to stay together and raise the offspring they produce. *DeBoer*, 2014 WL 5748990, at *11. It is quite another to say that a state may adopt a narrow definition of family, and pass laws that penalize those unions and households that do not conform. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973). The former represents the application of a generous and deferential standard of reviewing legislative classifications, one that permits "legislative choices [that] may rest on 'rational speculation unsupported by evidence or empirical data.'" *DeBoer*, 2014 WL 5748990, at *10 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). The latter amounts to a classification based "on an irrational prejudice," which cannot be sustained. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985). And when that occurs, courts play a vital role in our constitutional system to protect individual rights. *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 486 (1982) (explaining that the judiciary has a "special role in safeguarding the interests of [minority] groups that are 'relegated to such a position of political powerlessness as to command extraordinary protection from the majority political process'" (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973))).

The facts of the case and the circumstances of the plaintiffs were discussed in detail in the preliminary injunction opinion and order. *See Bassett*, 951 F. Supp. 2d at 946-49, 951. It is enough to say here that each of the plaintiffs is either an employee of a Michigan city, county, or school district or the domestic partner of such an employee. The plaintiff-couples have been in long-term, committed relationships, but cannot marry because Michigan law forbids it. Each of the non-employee partners enjoyed health care coverage provided by the local unit of government as a

benefit furnished to the municipal employee.  And each of the non-employee partners suffers from

medical conditions that require or will require medical treatment.

Public Act 297 would forbid local governmental units from providing health care benefits

to the non-employee partners unless they are married to a public employee, a relative, or a legal

dependant.  The Act states:

> Sec. 3. (1) A public employer shall not provide medical benefits or other fringe
> benefits for an individual currently residing in the same residence as a public
> employee, if the individual is not 1 or more of the following:
> (a) Married to the employee.
> (b) A dependent of the employee, as defined in the internal revenue code of 1986.
> (c) Otherwise eligible to inherit from the employee under the laws of intestate
> succession in this state.
> (2) A provision in a contract entered into after the effective date of this act that
> conflicts with the requirements of this act is void.
>
> Sec. 4. If a collective bargaining agreement or other contract that is inconsistent with
> section 3 is in effect for a public employee on the effective date of this act, section
> 3 does not apply to that group of employees until the collective bargaining agreement
> or other contract expires or is amended, extended, or renewed.

2011 Mich. Pub. Acts 297; Mich. Comp. Laws §§ 15.583-.584.

The events that led to this legislation, discussed in the earlier opinion, bear repeating, as they

shed light on the reasons behind the restrictive statutes.  Act 297 was one of the dominos that fell

some time after Michigan's voters amended their state constitution in 2004 to ban same-sex

marriage, declaring that "the union of one man and one woman in marriage shall be the only

agreement recognized as a marriage or similar union for any purpose."  Mich. Const. Art. 1, § 25.

At the time, the City of Kalamazoo had allowed same-sex partners of city employees to receive

health care and other benefits as the partner of a municipal worker.  But in 2005, then-Michigan

attorney general Michael Cox issued an opinion on the lawfulness of the City of Kalamazoo's

domestic partner benefits allowance in light of the marriage amendment.  He said that state and local

governments could not provide those benefits on the basis of a relationship "characterized by reference to the attributes of a marriage." Constitutionality of City Providing Same–Sex Domestic Partnership Benefits, Mich. Att'y Gen. Op. 7171 (Mar. 16, 2005), *available at* http://www.ag.state. mi.us/opinion/datafiles/2000s/op10247.htm (last visited November 10, 2014).

That opinion led to litigation filed in 2006 by a labor union, various public employees, and their domestic partners who sued seeking a declaratory ruling that the marriage amendment did not prohibit public employers from offering benefits to same-sex domestic partners. However, the Michigan Court of Appeals held that local governments' plans that offered same-sex domestic partner benefits used eligibility criteria similar to marriage and were invalid under the state constitution's marriage amendment. *National Pride At Work, Inc. v. Governor of Michigan*, 274 Mich. App. 147, 164, 732 N.W.2d 139, 151 (2007). But the court also believed that "[t]he amendment as written does not preclude the extension of employment benefits to unmarried partners on a basis unrelated to recognition of their agreed-upon relationship." *Id.* at 165, 172, 732 N.W.2d at 151, 155. The Michigan Supreme Court affirmed the court of appeals' decision. *National Pride At Work, Inc. v. Governor of Michigan,* 481 Mich. 56, 748 N.W.2d 524 (2008).

As a result of those holdings, some public employers revised their employee benefit plans. The City of Kalamazoo, the Ann Arbor Public Schools, and Ingham County introduced the status of "Other Qualified Adult" (OQA) into their plans. The plans allow the employees to designate a person with whom he or she lives and shares finances to receive benefits. Under those plans, an OQA must not be eligible to inherit from the employee, be related to the employee by blood in a degree of closeness that would prohibit marriage in Michigan, and not otherwise be eligible for benefits from the public employer. The OQA could be of either sex. The City of Ann Arbor,

-5-

Washtenaw and Eaton Counties, the school districts of Birmingham and Farmington, and Kalamazoo Valley and Lansing Community Colleges also modified their plans to allow OQA benefits.

The Michigan Civil Service Commission extended health care benefits to certain adult co-residents of state employees in January 2011. That decision prompted negative responses from several Michigan legislators. Representative Peter Lund, who later co-sponsored the Public Employee Domestic Partner Benefit Restriction Act, characterized the decision as "an absolute abomination . . . that shifts people's hard earned dollars into the pockets of same-sex partners." Press Release, Michigan House Republicans, *Lund Calls to Abolish Civil Service Commission* (Jan. 27, 2011), dkt. #18-8 at 4. The Michigan House of Representatives, which could have reversed the Civil Service Commission's decision, refused to do so. Representative Ken Yonker reacted by issuing a press release condemning the decision as "disgusting" and one that "makes a mockery of the moral fabric that has made America what it is today." Press Release, Representative Ken Yonker, *Yonker to House Democrats: This is Disgusting* (April 19, 2011), dkt. #18-8 at 8. In May 2011, Michigan attorney general Bill Schuette filed suit in Michigan state court to enjoin the Commission's action, claiming that granting benefits to other eligible adult individuals (OEAIs) exceeded the State's authority. The Michigan court rejected Schuette's argument. *Att'y Gen. Bill Schuette v. Mich. Civil Serv. Comm'n*, No. 11-538 (Mich. Cir. Ct. Oct. 6, 2011).

On June 16, 2011, Representatives David Agema and Peter Lund, among others, introduced House Bill No. 4770, the Public Employee Domestic Partner Benefit Restriction Act. HB–4770, As Passed House, September 15, 2011, *available at* http://www.legislature.mi.gov/documents/ 2011–2012/billengrossed/House/htm/2011-HEBH-4770.htm (last visited November 10, 2014). The Bill passed both houses of the Michigan Legislature and was signed by the defendant on December

-6-

22, 2011. It became effective on the same date. The governor's signing statement says that the law does not extend to university employees or state employees under civil service.

The law had a significant financial impact on the plaintiffs in the more than seven months that it was in effect before I granted the plaintiffs' motion for a preliminary injunction. For example, on December 31, 2012, plaintiff Barbara Ramber lost her health care benefits from her partner JoLinda Jach's health insurance plan because the City of Kalamazoo could no longer extend health care benefits to the domestic partners of its public employees. Between December 31, 2012 and August 1, 2013, the date her health insurance was restored, the couple paid $1,798 in premiums for individual coverage for Ramber. The policy had higher deductibles ($5,000 compared to $200 for in network care), provided no dental coverage, and contained larger medication and office visit co-pays than she received under her partner's plan before the passage of the Act. Additionally, Gerardo Ascheri and Doak Bloss paid $4,595 in premiums for health care coverage for Gerardo and $993 in out-of-pocket costs for his medication, deductibles, and dental care compared to the $1,830 in premiums he would have paid for OQA coverage that included dental care. Some of the other plaintiffs were spared the financial burdens of their chronic medical conditions when the injunction issued. The law has not been enforced after the preliminary injunction was entered. The State did not appeal the injunction.

Earlier this year, Governor Snyder filed a motion for summary judgment, seeking dismissal of the lawsuit. The plaintiffs responded in kind with a motion of their own, asking that the injunction be made permanent. The defendant also moved to stay the case after another judge in this district declared Michigan's marriage amendment unconstitutional. The defendant argued that if the present plaintiffs could marry as a result of that decision, their need for relief from Act 297

-7-

would become moot.  However, the State appealed the marriage amendment decision and obtained

a stay of that ruling.  And, as noted above, the State prevailed in its defense of traditional marriage.

*See DeBoer*, 2014 WL 5748990, at *27.  The present case is ready for decision.

## II.

The fact that the parties have filed cross motions for summary judgment does not

automatically justify the conclusion that there are no facts in dispute.  *Parks v. LaFace Records*, 329

F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary

judgment does not mean, of course, that summary judgment for one side or the other is necessarily

appropriate.").  Instead, the Court must apply the well-recognized summary judgment standards

when deciding such cross motions: when this Court considers cross motions for summary judgment,

it "must evaluate each motion on its own merits and view all facts and inferences in the light most

favorable to the nonmoving party."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir.

2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A trial is required only when "there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The parties have not seriously contested the basic

facts of the case.  Where the material facts are mostly settled, and the question before the court is

purely a legal one, the summary judgment procedure is well suited for resolution of the case.  *See

Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

The Court previously dismissed the plaintiffs' claims that Act 297 violates various aspects of the Due Process Clause. The remaining question, which is addressed by the parties in their motions, is whether the Act violates the Equal Protection Clause. All persons in the United States are entitled to "the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause of the Fourteenth Amendment "'prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)).

## A. Level of scrutiny

In the opinion granting the preliminary injunction, I discussed the appropriate level of scrutiny to which Act 297 should be subjected, concluding that Sixth Circuit precedent required application of the lowest level, that is, rational basis review. *Bassett*, 951 F. Supp. 2d at 961 (citing *Davis v. Prison Health Services*, 679 F.3d 433, 438 (6th Cir. 2012)). I discussed *Davis*'s pedigree, tracing it to *Bowers v. Hardwick*, 478 U.S. 186 (1986), which was overruled by *Lawrence v. Texas*, 539 U.S. 558 (2003). And I suggested that the Sixth Circuit should reexamine its precedent prescribing the appropriate level of scrutiny that ought to be used when examining laws that discriminate on the basis of sexual orientation, although it now appears that the appetite for that exercise is not voracious. *See DeBoer*, 2014 WL 5748990, at *18. Nonetheless, other courts have done so, since "[t]he Supreme Court has never decided explicitly whether heightened scrutiny should apply to sexual orientation discrimination." *Wolf v. Walker*, 986 F. Supp. 2d 982 (W.D.

Wisc. 2014) (citing *Lee v. Orr*, 13-cv-8719, 2013 WL 6490577, at *2 n.1 (N.D. Ill. Dec. 10, 2013),
*aff'd*, *Baskin v. Bogan*, 766 F. 3d 648 (7th Cir. 2014)).

The Supreme Court's most recent case discussing the equal protection clause and sexual
orientation, *United States v. Windsor*, --- U.S. ---, 133 S. Ct. 2675 (2013), does not even discuss the
standard of review when it invalidated section 3 of the Defense of Marriage Act (DOMA).  133 S.
Ct. at 2706 (Scalia, J., dissenting) ("The opinion does not resolve and does not even mention what
had been the central question in this litigation: whether, under the Equal Protection Clause, laws
restricting marriage to a man and a woman are reviewed for more than mere rationality.").  But after
that decision, several courts in this Circuit have applied heightened scrutiny to such classifications.
*See Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 986-87 (S.D. Ohio 2013) (finding that the Sixth
Circuit "no longer" has "sound precedential authority for the proposition that restrictions on gay and
lesbian individuals are subject to rational basis analysis" and suggesting that "lower courts, without
controlling post-*Lawrence* [*v. Texas*, 536 U.S. 558 (2003)] precedent on the [standard of review to
apply]" should "apply the criteria mandated by the Supreme Court to determine whether sexual
orientation classifications should receive heightened scrutiny."), *rev'd sub nom DeBoer v. Snyder*,
--- F.3d ----, 2014 WL 5748990, at *11 (6th Cir. Nov. 4, 2014); *see also Love v. Beshear*, 989 F.
Supp. 2d 536, 545 (W.D. Ky. 2014) (concluding that gays and lesbians are a quasi-suspect class and
classifications based on sexual orientation are subject to intermediate scrutiny); *Henry v. Himes*,
1:14-CV-129, --- F. Supp. 2d. --- 2014 WL 1418395, at *14 (S.D. Ohio Apr. 14, 2014)
("[C]lassifications based on sexual orientation must pass muster under heightened scrutiny to
survive constitutional challenge."), *rev'd sub nom DeBoer v. Snyder*, --- F.3d ---, 2014 WL 5748990,
at *11 (6th Cir. Nov. 4, 2014).  Other courts outside the Sixth Circuit have reached the same

-10-

conclusion. *See Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) ("[H]omosexuals compose a class that is subject to heightened scrutiny."); *Wolf*, 986 F. Supp. 2d at 1014 ("[S]exual orientation discrimination is subject to heightened scrutiny."): *Hamby v. Parnell*, 3:14-CV-00089-TMB, --- F. Supp. 3d --- 2014 WL 5089399, at *4 (D. Alaska Oct. 12, 2014) (applying heightened scrutiny to Alaska's ban on same-sex marriage); *Majors v. Jeanes*, 2:14-CV-00518 JWS, --- F. Supp. 3d --- 2014 WL 4541173, at *2 (D. Ariz. Sept. 12, 2014) ("[D]iscrimination based on sexual orientation must be evaluated using a heightened standard of review."); *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 430 (M.D. Pa. 2014) ("[G]ay and lesbian persons compose a class that is subject to heightened scrutiny."); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 333 (D. Conn. 2012) ("Having considered all four factors, this Court finds that homosexuals display all the traditional indicia of suspectness and therefore statutory classifications based on sexual orientation are entitled to a heightened form of judicial scrutiny."); *Varnum v. Brien*, 763 N.W.2d 862, 896 (Iowa 2009) (applying intermediate scrutiny to Iowa's same-sex marriage statute); *see also Baskin v. Bogan*, 766 F.3d 648, 656 (7th Cir. 2014) ("The discrimination against same-sex couples is irrational, and therefore unconstitutional even if the discrimination is not subjected to heightened scrutiny.").

And in *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471 (9th Cir. 2014), the Ninth Circuit concluded that *Windsor* actually "*requires* that heightened scrutiny be applied to equal protection claims involving sexual orientation." *Id.* at 481 (emphasis added). Although the court of appeals acknowledged that *Windsor* did not expressly announce the level of scrutiny it applied, the court held that "[i]n its words and its deed, *Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review."

-11-

*Ibid.* The Ninth Circuit reached this conclusion for four reasons: (1) the Supreme Court focused on the actual purpose and effect of the law rather than conceivable justifications as is typically required under rational basis review; (2) the Court required the government to justify the disparate treatment the law imposed on gay and lesbian couples; (3) the Court considered the harm that the law caused same-sex couples; and (4) the Court refused to afford the law a presumption of validity and instead balanced the government's interest against the harm to gay and lesbian couples.

Nonetheless, *Davis v. Prison Health Services*, tarnished provenance and all, still stands as circuit precedent for applying rational basis review to laws that discriminate on the basis of sexual orientation, and the Court will apply it here. But even that standard has subtle variants.

Ordinarily, laws subjected to rational basis review enjoy a strong presumption of validity. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). And generally speaking, "[l]aws that do not involve suspect classifications and do not implicate fundamental rights or liberty interests . . . will be upheld if they are 'rationally related to a legitimate state interest.'" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002) (quoting *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000)). When testing legislation against this deferential standard, "courtroom factfinding" must be avoided; and the law "may be based on rational speculation unsupported by evidence or empirical data." *Alexander v. Merit Sys. Prot. Bd.* 165 F.3d 474, 484 (6th Cir. 1999) (internal quotation marks and citation omitted). In the words of the Supreme Court, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

-12-

But when "[a] protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible," *Massachusetts v. U.S. Dept. of Health & Servs.*, 682 F.3d 1, 10 (1st Cir. 2012), a different, "more searching form of rational basis review [goes to work] to strike down such laws under the Equal Protection Clause." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring). This makes good sense and aligns with the judicial function in our form of government. Although majority rule is a bedrock principle of democratic governments, *California Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) (observing the "democratic principle that — except where constitutional imperatives intervene — the majority rules"), republicanism — the idea that people have certain unalienable rights that cannot be squelched by the majority — is the guiding political philosophy that animates the Constitution, *see Lathrop v. Donohue*, 367 U.S. 820, 883 (1961) ("Although in political democracy the rule of the majority is necessary, the American system of democracy is based upon the recognition of the imperative necessity of limitations upon the will of the majority."). Courts play a vital role in protecting against "the tyranny of shifting majorities." *See I.N.S. v. Chadha*, 462 U.S. 919, 961 (1983) (Powell, J., concurring) (quoting The Federalist No. 48, p. 336 (J. Cooke ed. 1961)).

The Supreme Court has long recognized that despite democracy's virtues, "prejudice against discrete and insular minorities" has, at times, "curtail[ed] the operation of those political processes ordinarily . . . relied upon to protect minorities." *United States v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938). And the Court has emphasized that "[t]he concept of equal justice under law requires the State to govern impartially. The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective."

-13-

*Lehr v. Robertson*, 463 U.S. 248, 265 (1983) (internal citation omitted). Therefore, "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Romer v. Evans*, 517 U.S. 620, 633 (1996); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973) (holding that a law intended "to harm a politically unpopular group cannot constitute a legitimate governmental interest"); *see also Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1997) ("It is a venerable rule under the Equal Protection Clause that the state may not choose to enforce even facially neutral laws differently against different portions of the citizenry solely out of an arbitrary desire to discriminate against one group.").

In cases where governmental animus is found, the Supreme Court has "depart[ed] from th[e] well-trod path" of accepting any conceivable justification for a discriminatory law and "t[aken] up equal-protection challenges to government action that distinguished between people on the basis of characteristics that the Court had not deemed suspect or quasi-suspect." *Bishop v. Smith*, 760 F.3d 1070, 1097-98 (10th Cir. 2014) (Holmes, J., concurring) (citing *Romer* (law classifying on the basis of sexual orientation); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 436-37 (1985) (law classifying on the basis of intellectual disability); *Moreno* (law classifying between households where the members were related to one another and households where they were not)).

When a law discriminates against a non-suspect group because of that group's characteristics, the State's motives are called into question and the standard of review is "less deferential than the traditional rational basis standard." *Am. Exp. Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 692 (6th Cir. 2011) (citing Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 759-60 (2011) (noting that the level of scrutiny applied by the Court in *Cleburne*,

*Moreno*, and *Romer* "depart[s] from the usual deference associated with rational basis review," and "commentators have correctly discerned a new *rational basis with bite* standard in such cases" (emphasis added))). That standard — rational basis with bite, as it has been called — is appropriate here, if Act 297 found its way into law because of animus toward same-sex partners.

### B.  Animus

The concept of animus focuses on legislative motivation.  *Am. Exp. Travel Related Servs.*, 641 F.3d at 692 & n.2 (noting that '[i]n each of the [animus cases], the Supreme Court or this Court concluded that the legislation at issue was *in fact* intended to further an improper government objective" (emphasis added)).  "Those motives could be viewed as falling somewhere on a continuum of hostility toward a particular group."  *Bishop*, 760 F.3d at 1099 (Holmes, J., concurring).  On the extreme end of the continuum, legislators may pass a law based on "a desire to harm a politically unpopular group."  *Moreno*, 413 U.S. at 534.   However, an impermissible motive does not always reflect "malicious ill will."  *Obergefell*, 962 F. Supp. 2d at 992 (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring)). It can also take the form of "negative attitudes," "fear," "irrational prejudice," or "some instinctive mechanism to guard against people who appear to be different in some respect from ourselves." *Ibid.* (citing *City of Cleburne*, 473 U.S. at 450 *and Garrett*, 531 U.S. at 374 (Kennedy, J., concurring)).  "In this sense, animus may be present where the lawmaking authority is motivated solely by the urge to call one group 'other'" or "to separate those persons from the rest of the community."  *Bishop*, 760 F.3d at 1100 (Holmes, J., concurring).  The "dominant theme" in those cases "is to end otherness, [and] not to create new others."  *DeBoer v. Snyder*, 2014 WL 5748990, at *15.

-15-

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).   To assess whether animus motivated particular legislation, courts start with "certain basic questions.  What class is harmed by the legislation, and has it been subjected to a 'tradition of disfavor' by our laws?  What is the public purpose that is being served by the law?  What is the characteristic of the disadvantaged class that justifies the disparate treatment?"   *City of Cleburne*, 473 U.S. at 453 (Stevens, J., concurring) (footnotes omitted).  Drilling down, one court, helpfully, suggested that animus exists if a law is structurally aberrational.  Structural aberration occurs when the law (1) "impose[s] wide-ranging and novel deprivations upon the disfavored group;" or (2) "stray[s] from the historical territory of the lawmaking sovereign to eliminate privileges that a group would otherwise receive." *Bishop*, 760 F.3d at 1100 (Holmes, J., concurring).  The Sixth Circuit has identified a similar but expanded list of factors that can be used to detect whether state action was motivated by a discriminatory purpose: (1) the impact of the official action on the group challenging the classification; (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that preceded the state action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history.  *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002) (citing *Village of Arlington Heights*, 429 U.S. at 266-68).

### 1.  Deprivations imposed on a disfavored group

To begin, Public Act 297, as its title suggests, was enacted to impose "[r]estrictions" on the health care and other "[b]enefit[s]" of "[p]ublic [e]mployee['s] [d]omestic [p]artner[s]."  And, true

to its name, the detrimental impact of Act 297 falls most heavily on gay and lesbian partners and families with OQA benefits. If Public Act 297 is allowed to continue in effect, it is undisputed that the plaintiffs will face significant financial hardships. As Kenneth P. Collard, the City Manager for the City of Kalamazoo notes: the loss of OQA benefits "is, in effect, a loss of income for these employees' families. . . ." Collard Dec., dkt. #21-13, at ¶ 23. Joe Breakey estimates that purchasing a comparable health insurance plan would cost his family between $8,000 and $10,000 each year. Breakey Dec., dkt. #21-11 at 16 ¶ 9. Barbara Ramber estimates that purchasing insurance from the Kalamazoo Public Schools would cost $540 per month – more than half of her monthly take-home pay and more than her family can afford. Ramber Dec., dkt. #21-11, at 25 ¶ 9. Gerardo Ascheri estimates that alternative coverage would cost $500 per month in premiums, almost $400 more than his family pays for his health insurance now. Ascheri Dec., dkt. #21-11, at 32 ¶ 9, Bloss Dec., dkt. #21-11, at 29 ¶ 10.

This financial burden falls directly and exclusively on public employees with same-sex partners. Although the law also impacts unmarried heterosexual couples, those couples could choose to marry if they wished to retain their current family health benefits, and avoid the deprivation imposed by the law. As we have recently learned, gay couples cannot marry within the four states of this circuit, including Michigan, under current law. This the defendant cannot deny.

One need not look very far to learn that gays and lesbians are a disfavored group. In 2012, twelve percent of all reported hate crimes in Michigan targeted gays and lesbians. Michigan State Police, *2012 Hate/Bias Crime Report*. Gays and lesbians in Michigan have a 27 percent chance of experiencing discrimination in obtaining housing. Pam Kisch and Pat Winston, eds., *Sexual Orientation and Housing Discrimination in Michigan* (2006). The State of Michigan provides no

protection against harassment or employment discrimination on the basis of sexual orientation. *Barbour v. Dep't of Soc. Services*, 198 Mich. App. 183, 185, 497 N.W.2d 216, 217–18 (1993).  And the Michigan Legislature has not repealed its sodomy or gross indecency statutes, despite the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), nearly twelve years ago.  *See* Williams Institute, *Michigan—Sexual Orientation and Gender Identity Law and Documentation of Discrimination* 16 (2009).

Many courts have acknowledged this unfortunate fact.  *See DeBoer*, 2014 WL 5748990, at *18 ("We cannot deny the lamentable reality that gay individuals have experienced prejudice in this country, sometimes at the hands of public officials, sometimes at the hands of fellow citizens."); *De Leon v. Perry*, 975 F. Supp. 2d 632, 651 (W.D. Tex. 2014) ("Plaintiffs have established that homosexuals have been subjected to a long history of discrimination."); *Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 175, 957 A.2d 407, 432 (2008) ("Gay persons have been subjected to and stigmatized by a long history of purposeful and invidious discrimination that continues to manifest itself in society."); *Parker v. Hurley*, 474 F. Supp. 2d 261, 264 (D. Mass. 2007) ("Our history . . . includes instances of individual and official discrimination against gays and lesbians, among others."); *High Tech Gays v. Def. Indus. Sec. Clearance*, 895 F.2d 563, 573 (9th Cir. 1990) ("homosexuals have suffered a history of discrimination.").   "Until quite recently," gays and lesbians, "had, as [gays and lesbians], no rights."  *Baskin v. Bogan*, 766 F.3d 648, 665 (7th Cir. 2014).  The federal government categorically discriminated against gays and lesbians in immigration until 1990, barring all gay and lesbian noncitizens from entering the United States.  *See Boutilier v. INS*, 387 U.S. 118, 120 (1967) (concluding that the legislative history of the Immigration and Nationality Act of 1952 "indicated beyond a shadow of a doubt that Congress intended the phrase

'psychopathic personality' to include homosexuals.").  And the Immigration and Nationality Act of 1952 labeled gay and lesbian people as mentally ill.  *Ibid.*  "In 1953, President Eisenhower issued an executive order banning the employment of homosexuals and requiring that private contractors currently employing gay individuals search out and terminate them."  *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 427 (M.D. Pa. 2014) (internal citations omitted).  "Although the ban on hiring gay employees was lifted in 1975, federal agencies were free to discriminate against homosexuals in employment matters until President Clinton forbade the practice in 1998."  *Ibid.*  "Beginning in World War II, the military developed systematic policies to exclude personnel on the basis of homosexuality, and, following the war, the Veterans Administration denied GI benefits to service members who had been discharged because of their sexuality."  *Ibid.*  The history of sexual-preference-based discrimination runs deep.

In light of the reactions to the Michigan Civil Service Commission's furnishing benefits to the same-sex partners of public employees, noted earlier, it is hard to deny that these attitudes persist today.  And it is equally difficult to ignore the inference that Act 297 emerged from those attitudes.

The defendant says that the law has other purposes that are legitimate, which, he insists, courts cannot look behind or even question.  And perhaps he would be right if the applicable test is grounded on traditional rational basis review, where "legislative choices may rest on 'rational speculation unsupported by evidence or empirical data.'"  *DeBoer*, 2014 WL 5748990, at *10 (quoting *Beach Commc'ns*, 508 U.S. at 315).  But because the Supreme Court's animus cases require an assessment of motive, courts must look behind the stated justifications to see whether they actually relate to a legitimate governmental purpose.

The defendant cites three such purposes: (1) Act 297 demonstrates a preference for marriage and ensures that the benefits of marriage are not distributed to people that are not married; (2) it eliminates policies that disfavor familial relationships; and (3) it promotes the State's fiscal goals of reducing the costs to government and promoting financially sound local government units. I will examine these one at a time.

### a. Preference for marriage

It is curious that the defendant claims to promote marriage by enacting restrictions that fall most heavily on a discrete group that cannot marry under law. The defendant, in essence, justifies discriminating *against* a group by noting that the law *promotes* the interests of the group's counterpart. That is no justification at all. Discrimination against one group cannot be justified merely because the legislature prefers another group. *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 882 n.10 (1985). As Justice Scalia said bluntly: "'preserving the traditional institution of marriage' is just a kinder way of describing the [s]tate's moral disapproval of same-sex couples." *Lawrence*, 539 U.S. at 601 (Scalia, J., dissenting). However, "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence*, 539 U.S. at 577 (internal quotation marks omitted). As the Supreme Court has held, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). A classification may not be "drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633 (citing *Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 181 (1980) (Stevens, J., concurring)). Rather, the classification must advance a state interest that is separate from the classification itself. *Ibid.*

-20-

In the same vein, the defendant contends that Public Act 297 augments laws that maintain family relationships. That is true only if one adopts a very narrow definition of family. Certainly, many married couples enjoy relationships characterized by love, affection, and commitment. But as the Sixth Circuit recently acknowledged, "[g]ay couples, no less than straight couples, are capable of sharing such relationships. And gay couples, no less than straight couples, are capable of raising children and providing stable families for them. The quality of such relationships, and the capacity to raise children within them, turns not on sexual orientation but on individual choices and individual commitment." *DeBoer v. Snyder*, 2014 WL 5748990, at *10.

Each of the plaintiffs in this case has enjoyed a long-term, committed, and financially interdependent relationship; several are raising children together. Public Act 297 does not maintain those family relationships; it aims to destroy them. The Act humiliates the plaintiffs' families and the "tens of thousands of children now being raised by same-sex couples." *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013). "The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Ibid.* The Constitution prevents the State of Michigan "from standardizing its children and its adults by forcing all to live in certain narrowly defined family patterns." *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 506 (1977). The defendant asks too much when it exhorts the Court to believe that the legislature thought Act 297 would create a preference for "familial relationships recognized by state law" by encouraging heterosexual couples to marry. The defendant admitted as much in his motion to dismiss, stating that "it strains credulity to believe that a couple would marry simply to obtain health benefits, or would acquiesce to participating in a relationship they might not otherwise choose in order to qualify for the benefit."

Def.'s Am. Mot. to Dismiss at 24. And although the defendant has submitted evidence that traditional marriage may benefit the State, he has not presented any credible argument as to how Public Act 297 actually furthers traditional marriage.

Public Act 297 sends a message to committed gay and lesbian partners that the State of Michigan is willing to invest in the health of married heterosexual couples, but is unwilling to invest (or allow local governments to invest) in the health of similarly-situated same-sex partners who cannot marry. How does that promote traditional marriage? Several of the plaintiffs, who are covered by their partners' health insurance, have health conditions that require ongoing monitoring and care, including arthritis, glaucoma, high blood pressure, and fibroid tumors. How does prohibiting local governments from furnishing health insurance to those partners benefit the State in any way? And how does this justification amount to anything more than a desire to impose a deprivation upon a disfavored group? The defendant has not answered these questions in a way that dampens the inference of animus.

### b. Elimination of policies disfavoring familial relationships

The defendant says that Public Act 297 eliminates local government programs that are irrational and unfair to traditional families. The reasoning behind this justification is largely theoretical, and, when viewed in the context of the local government's actual OQA plans, flawed. According to the defendant, the benefit plans Act 297 would eradicate are unfair to traditional families because they would allow an unmarried public employee to share his benefits with anyone he designates, but a married employee could only share her benefits with her spouse. The defendant believes that such a system creates an "anomaly" that is "unfair" and "absurd," and somehow it disfavors family relationships.

-22-

It is not apparent how the benefit plans targeted by Act 297 disfavor families, traditional or otherwise.  The defendant seems to think that the benefit programs allow public employees to share their health care with resident strangers.  But the defendant mischaracterizes the OQA programs.  Almost all of the programs contain stringent criteria for designating an OQA, including that the applicant must establish long-term cohabitation and financial interdependence before qualifying for benefits.  *See, e.g.*, Ingham County OQA Criteria, dkt. #18-5; Ann Arbor OQA Criteria, dkt. #88-4; City of Kalamazoo OQA Critieria, dkt. #18-3.  The defendant counters that such arrangements resemble too closely traditional families and conventional marriage, and a statute that prohibits such programs therefore is justified by the State's policy against same-sex unions.  But once again, this argument rests on the unspoken premise that same-sex domestic partners do not constitute families.  They do.

The defendant asserts that Michigan's public policy, as reflected in its marriage amendment, is to recognize only traditional marriage relationships, so that Public Act 297's preventing local governments from extending fringe benefits to same-sex partners is rational.  That justification can be "rational" only if the State could promote a favored group by imposing a deprivation upon a disfavored "other" one.  That justification, however, runs afoul of the Equal Protection Clause.  Public Act 297 effectively singles out one type of family formation — same-sex domestic partners — and bars employers from providing benefits to them.  Although public "employees and their families are not constitutionally entitled to health benefits, . . . when a state chooses to provide such benefits, it may not do so in an arbitrary or discriminatory manner that adversely affects particular groups that may be unpopular."  *Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011).  The

-23-

defendant's articulation of this justification for the law supports rather than discourages a finding of animus.

### c. Costs savings

The defendant contends that economics justify the legislation, and therefore there is a rational basis for it. There is little evidence that the desire to save the State money ever motivated the law initially, and the defendant does not suggest that its argument is anything more than post hoc reasoning. The defendant is correct when he argues that the justification for the law does not have to be correct in hindsight. *Am. Exp. Travel Related Servs.*, 641 F.3d at 690 (noting that under traditional rational basis review, "if a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny"). However, the defendant's rationalization based on saving money is nothing more than a Potemkin Village; there is no substance backing up its reasoning.

*First*, there was no analysis of the potential fiscal impact on local governments, the population Public Act 297 impacts. House Fiscal Agency, Legislative Analysis, dkt. #88-10, at 7. Moreover, the state legislature's fiscal analysis of Public Act 297 is based on inaccurate information about any cost savings that would result. The Office of the State Employer ("OSE") provided an initial estimate that the Act would save the State $8 million. House Fiscal Agency, Legislative Analysis, dkt. #88-10, at 6. But that analysis was based on potential cost savings that would result from no longer providing OQA benefits to *state* employees, and was later revised downwards by the Senate Fiscal Agency to $893,000. Senate Fiscal Agency, dkt. #88-12, at 2. The district court in Arizona found similar evidence sufficient to grant a motion for a preliminary injunction in a nearly identical equal protection claim. *Collins v. Brewer*, 727 F. Supp. 2d 797, 811-12 (D. Ariz. 2010),

*aff'd sub nom Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011).  In affirming that decision, the Ninth Circuit highlighted the fact that the district court was provided with an expert analysis of the law on the state's finances but did not have any evidence as to the number of same-sex domestic partners participating in the health plan or the costs of such participation.  *Diaz*, 656 F.3d at 1013.  The defendant's evidence here is similarly deficient.

*Second*, the Act does not impact the amount of funding that the State provides to local governments.  The Michigan constitution and state statutes allocate state funds to local governments based on various formulas.  Mich. Const. Art. IX, sec. 30 (1963); Mich. Comp. Laws §§ 18.1115(5), 18.1349.  The funds that local governments receive from the State is largely contingent on the population of the city, township, or village; the funds that school districts receive is largely per pupil.  Mich. Const. Art. IX, sec. 10 (1963); Mich. Comp. Laws §§ 141.913, 141.911.  The State's funding formula does not take into account the number of public employees, the number of public employees receiving health insurance benefits, or the number of people insured.  Thus, whether a local government provides OQA benefits does not affect the amount of state funding that local governments receive.

Nor will the money that local governments would have spent on OQA benefits be returned to the State if Public Act 297 survives.  Before the enactment of Public Act 297, local governments paid for the benefits out of their general funds.  Comsa Dep., dkt. #88-27, at 22:7-8.  Funds that the State provides to local governments is generally unrestricted.  Mich. Comp. Laws § 141.917.  Several local governments submitted declarations that they voluntarily provided OQA benefits to recruit and retain employees and reflect community values, among other reasons.  Comsa Decl. Dkt. #88-27 at 28; Dolehanty Decl., dkt. #88-25 at 2; Wilkerson Decl., dkt. #88-26, at 2.  Timothy J.

-25-

Dolehanty, the Controller for Ingham County, declared that "[e]nding OQA benefits for Ingham County employees would not impact the amount of State money the County receives . . ., [and] [a]ny cost savings associated with an involuntary termination of OQA benefits . . . would accrue to the County or potentially to the federal government, not the state." Dolehanty Decl., dkt. #88-25, at 9 ¶30. David A. Comsa, the Deputy Superintendent for Human Resources and General Counsel for Ann Arbor Public Schools, explained that if "Ann Arbor Public Schools in the future is forced to cease making [OQA] benefits available to any of its employees, the small amount of reduced expenditures on benefits would accrue to the District not to the State." Comsa Decl. Dkt. #88-27 at ¶23. The State admitted in responses to interrogatories that "[n]o impact on the State or its budge[t] have resulted from the preliminary injunction entered in this case." Defendant's Answers to Plaintiffs Third Set of Interrogatories, dkt. #21, at 2. Thus, there is no genuine dispute that Public Act 297 has had no impact on the State's fiscal health.

*Third*, the Act may actually cost the State money. Many public employees pay state income tax on their employers' contributions to their partners' benefits; if employers can no longer offer these benefits, the State will lose this tax revenue. Badgett Rep., dkt. #88-23 at 12-13. Moreover, individuals affected by the Act who cannot afford to purchase insurance independently may rely on Medicaid or other government-sponsored health care programs. *Id.* at 14.

The defendant's expert, Dr. Joseph Price, could not identify any direct cost savings to the State of Michigan caused by Public Act 297. Dr. Price suggested that "[r]estricting partner health benefits to married couples creates an additional incentive for couples to marry and this decision to marry produces economic benefits for the state of Michigan." Price Report, dkt. #91-3, ¶ 42. But Dr. Price admitted at his deposition that he has no empirical basis to say that marriage results in any

increase to household income compared to cohabitation, Price Dep. at 248:23-249:7; no empirical foundation to conclude that State tax revenue would increase if cohabiting couples married, *id.* at 249:15-19; and no empirical grounds to opine that marriage creates positive health outcomes versus cohabitation, *id.* at 160:24-161:4. Dr. Price concluded in his report that "the most direct impact of marriage is on the costs involved with the criminal justice system." Price Report ¶ 23. But Dr. Price admitted at his deposition that he could not cite any data to support the proposition that crime would decrease if cohabiting couples married. Price Dep. at 124:5-8; 126:1-7; 124:18-22. In fact, Dr. Price admitted that he did not compare cohabiting and married couples for any purpose whatsoever. *Id.* at 239:3-17. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [defendant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rank speculation will not suffice.

*Fourth*, although the State has an interest in the fiscal health of its cities and townships, it is uncontested that any cost savings to local governments wrought by Act 297 would be minimal. For instance, of the 689 employees of the City of Kalamazoo, only six added an OQA to their plan as of late 2011, Kenneth P. Collard Dep., dkt. #88-16, at ¶ 6, and the number of OQAs had not changed as of February 2014, Post. Dep., dkt #88-29 at 22:22-23:5. Of approximately 1,800 full-time employees for the Ann Arbor Public Schools, thirty-three had enrolled OQAs as of January 2012, dkt. #21-13, at ¶¶ 2, 5, and only twenty were enrolled in February 2014. Camsa Dep., dkt. #88-27 at 10, 12. And of the 798 Ingham County employees eligible to participate in 2014 and 402 Kalamazoo Valley Community College employees eligible in 2012, only five and one had enrolled OQAs, respectively. Dolehanty Decl, dkt. #88-25, at ¶¶ 7-8; KVCC's Response to Plaintiffs' RPD,

dkt. #38, ¶¶ 3, 13.  These numbers are consistent with evidence indicating that few employees enroll OQAs.  Badgett Report, dkt. #88-23, at 8.  Furthermore, the cost of providing OQA benefits is only a small fraction of local government's health care costs.  The City of Kalamazoo's costs for OQA benefits was .45% of total 2011 health insurance costs, Collard Dec., dkt. #21-13, at ¶ 12, Ann Arbor Public School's estimated costs represented 1.2% of 2011-2012 health insurance costs, Comsa Dec., dkt. #21-13, at ¶ 11, and Ingham County's projected costs represented only .002% of the County's projected 2014 health insurance costs, Dolenhanty Dec., dkt. #88-25, at ¶ 13.

*Fifth*, there is some evidence that eliminating OQA benefits will increase costs to local governments.  Local governments voluntarily created OQA programs to attract and retain the highest quality workers.  Collard Dec., dkt. #21-13 at ¶¶ 20-25; Comsa Dec., dkt. #21-13 at ¶¶ 15-19, Post Dep., dkt. #88-29 at 16-17, Comsa Dep, dkt. #88-17 at 7-10.  For example, the City of Kalamazoo adopted its plan to compete with private sector employers that offered such benefits.  Collard Dec., dkt. #21-13, at ¶¶ 20-23.  The City Manager for the City of Kalamazoo declared that the OQA policies "have saved the City literally millions of dollars."  *Id.* at ¶ 20.  Jerome Post, the human resources and labor relations director for the City of Kalamazoo, testified that he accepted his position with the City of Kalamazoo over employment in the private sector because it offered OQA benefits.  Post Dep., dkt. #88-29 at 19:15-20:10.  Before the passage of Public Act 297, several local governments expressed concern that failing to provide OQA benefits would undermine those successes.  For example, in November 2011, Ingham County passed a resolution stating "if this legislation were signed into law, Ingham County would be construed to be a less desirable employer to potential employees."  Lannoye Dec., dkt. #88-17, at ¶23.  Dr. Badgett concluded that failing to offer benefits may increase employee attrition and raise the cost to local employers of recruiting and

retaining talented employees.  Badgett Report, dkt. #88-23, at 16-19.  Her conclusions are supported

by a 2007 survey of corporate employees, which showed that 41 percent of gay and lesbian people

that left their job "would have been very likely to have stayed if their employer offered to pay them

more fairly . . . [B]etter benefits was the top concern of gay and lesbian professionals and

managers."  *Id.* at 17.  Some employees have even contemplated moving out of the State of

Michigan because of the passage of Public Act 297.  Ways Decl., dkt. #21-11, at  ¶ 11, Breakey

Dec., dkt. #21-11 at ¶ 12, Bloss Dec., dkt. #21-11, at ¶ 11.  There is no genuine dispute that cost

savings justify the Act. They do not.

As noted earlier, the State did not have to be correct in its estimate that Act 297 would save

it money, if indeed it held that view at the time.  But the lack of substance behind this stated

justification does little to dispel the "suspicion that bigotry rather than legitimate policy is afoot."

*DeBoer*, 2014 WL 5748990, at *19.  Although "a state has a valid interest in preserving the fiscal

integrity of its programs" and "may legitimately attempt to limit its expenditures . . . a State may not

accomplish such a purpose by invidious distinctions between classes of its citizens."  *Shapiro v.*

*Thompson*, 394 U.S. 618, 633 (196), *overruled in part on other grounds by Edelman v. Jordan*, 394

U.S. 618, 634 (1969).  And, although the Sixth Circuit has not addressed the issue, the First and

Ninth Circuits have held that cost savings alone are insufficient to justify an otherwise

discriminatory statute.  *Massachusetts v. United States Dep't of Health and Human Servs.,* 682 F.3d

1, 11, 14 (1st Cir. 2012); *Diaz,* 656 F.3d at 1013-14.

2.  Departures from the government's normal procedural process

Another badge of animus can be found when a legislature "stray[s] from [its] historical

territory" to enact a law that "eliminate[s] privileges that a group would otherwise receive."  *Bishop*,

-29-

760 F.3d at 1100 (Holmes, J., concurring). Such is the case here. When enacting Public Act 297, the legislature took the unusual step of telling local governments that they could not offer employee fringe benefits to a specific class of people who had been receiving them up to then. The defendant insists that Act 297 is a logical and cohesive part of the effort to reduce costs and address the fiscal insecurity of local governments, referencing other legislation that was intended to fortify the fiscal stability of local governments. As examples, the defendant points to laws authorizing the appointment of emergency financial managers, mandating contributions by public employees to their retirement plans, and capping public employer contributions to publically-funded health insurance. Those laws, all of a piece, are different from Act 297, in that they do not single out a class of public employees for different treatment, nor do they purport to dictate value judgments traditionally left to local governmental units.

Public Act 297 is a substantial departure from Michigan's strong tradition of home rule. *See Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44, 66, 214 N.W.2d 803, 814 (1974) ("Michigan is a strong home rule state with basic local authority."); *see also* Mich. Comp. Laws § 117.4j(3) (committing to cities "all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants"). It is true that cities are political subdivisions of the State, but Michigan's current constitution "continues the grant of broad power and authority to home rule cities." *Adams Outdoor Adver., Inc. v. City of Holland*, 234 Mich. App. 681, 687, 600 N.W.2d 339, 342 (1999) (citing Mich. Const. art. 7, § 22 (1963)). Indeed, the defendant admitted that he was unaware of any law other than Public Act 297 that "placed any limits on the categories

-30-

of Insured to whom local governmental units could provide health insurance benefits." *See* Requests for Admission No. 1 and 2, dkt. #88-19 at 209.

Public Act 297 departs from Michigan's "history and tradition" of strong home rule for local units of government, and amounts to a "'discrimination[] of an unusual character.'" *See Windsor*, 133 S. Ct. at 2692 (quoting *Romer*, 517 U.S. at 633). It is a structural aberration, which leads to the conclusion that the law was motivated by animus, passed to harm same-sex couples in which one partner was employed by a local government.

## C.

As one court succinctly stated, "once animus is detected, the inquiry is over: the law is unconstitutional." *Bishop*, 760 F.3d at 1103 (Holmes, J., concurring). The reason is straightforward: even under the deferential and forgiving rational basis standard of review, the law must have a legitimate purpose. *See Hadix v. Johnson,* 230 F.3d 840, 843 (6th Cir. 2000) (declaring that "rational basis review is not a rubber stamp of all legislative action, as discrimination that can *only* be viewed as arbitrary and irrational *will* violate the Equal Protection Clause"). A law is irrational if its purpose is to target a disadvantaged group. *Romer*, 517 U.S. at 632 ("[T]he amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."); *Cleburne*, 473 U.S. at 448 ("[M]ere negative attitudes, or fear, . . . are not permissible bases for [a statutory classification]."); *Moreno*, 413 U.S. at 534 ("[The] amendment was intended to prevent socalled 'hippies' and 'hippie communes' from participating in the food stamp program," and such "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). Public Act 297 was enacted to deprive the same-sex partners of public employees of health and other fringe benefits offered by local units of

government.  The defendant has not identified any other credible justification for the law.  The Supreme Court has explained that "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 133 S. Ct. at 2693 (quoting *Moreno*, 413 U.S. at 534-35).  Public Act 297, the Public Employee Domestic Partner Benefit Restriction Act, therefore violates the Equal Protection Clause and is unconstitutional.

### D.  Permanent injunction

It is well settled that if the plaintiffs establish a constitutional violation after prevailing on the merits, the plaintiffs are entitled to a permanent injunction upon a showing of (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law.  *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998).  Both of those requirements are easily met here.

The defendant does not dispute that the plaintiffs will suffer irreparable harm if Public Act 297 is enforced or that the plaintiffs do not have an adequate remedy at law.  "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 472 U.S. 347, 373 (1976)).  "Moreover, the potential risk to the plaintiffs' health resulting from the loss of medical insurance qualifies as irreparable harm." *Bassett*, 951 F. Supp. 2d at 970.  However, the defendant argues that a permanent injunction is inappropriate because a declaration of unconstitutionality is sufficient.

"Rule 57 of the Federal Rules of Civil Procedure permits declaratory relief although another adequate remedy exists." *Katzenbach v. McClung*, 379 U.S. 294, 296 (1964).  A declaratory

judgment is particularly appropriate if only part of a law is found unconstitutional. It has been characterized as "a much milder form of relief than an injunction." *Steffel v. Thompson*, 415 U.S. 452, 471 (1974). The defendant has failed to demonstrate "why a much milder form of relief" is appropriate. The case does not involve a criminal statute or anticipatory litigation. Nor is a declaratory judgment sufficient to encourage the State to enforce the Act differently or to persuade the State to repeal or modify the Act. Although a declaratory judgment "may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt." *Ibid.* A permanent injunction is appropriate because nothing in Public Act 297 is salvageable. This is not the place for a light touch.

The defendant also cites cases that address standing. In one, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the Court found that the plaintiff lacked standing to seek injunctive relief preventing the Los Angeles Police Department (L.A.P.D.) from using a choking-hold during arrests because the threat of injury in the future was too speculative to confer standing for injunctive relief. *Id.* at 105. In another, *Grendell v. Ohio Supreme Court*, 252 F.3d 828 (6th Cir. 2001), the Sixth Circuit held that the plaintiff failed to establish a sufficient injury in fact to seek injunctive relief against the Ohio Supreme Court and four justices preventing the imposition of certain sanctions on the ground that the rule was facially unconstitutional. The court of appeals found that the threat of Grendell's future injury depends on a string of actions that was highly speculative. *Id.* at 833.

Unlike *Lyons* and *Grendell*, the threat of future harm does not depend on the occurrence of speculative events. As I explained in the opinion granting the preliminary injunction, *Bassett*, 951 F. Supp. 2d at 970-71, if Public Act 297 is enforced, the plaintiffs will face continuing irreparable

harm from the loss of medical benefits. The plaintiffs have satisfied the requirements for a permanent injunction.


                                        III.

The Public Employee Domestic Partner Benefit Restriction Act, Public Act 297 (2011), violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it unlawfully discriminates against the same-sex partners of public employees without a legitimate basis for doing so.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #88] is **DENIED**, and the plaintiff's motion for summary judgment [dkt. #88] is **GRANTED**.

It is further **ORDERED** that Public Act 297 (2011), Michigan Compiled Laws §§ 15.583-.584 is declared to violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and therefore is repugnant to the Constitution.

It is further **ORDERED** that the defendant and all those in active concert and participation with him who receive actual notice of this order are **RESTRAINED AND ENJOINED** from enforcing Public Act 297 (2011), Michigan Compiled Laws §§ 15.583-.584.

                                        s/David M. Lawson
                                        DAVID M. LAWSON
                                        United States District Judge

Dated:  November 12, 2014

                                        -34-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 12, 2014.

s/Susan Pinkowski
SUSAN PINKOWSKI